JOSEPH G. BALDWIN, Appellant, v. P. A. DESGRANGES and DELLA DESGRANGES.—No. 39721.—199 S. W. (2d) 353.

Division One, January 13, 1947.

Rehearing Denied, February 10, 1947.

*Tedrick & Tedrick* and *Sam M. Phillips* for appellant.

*Clarence A. Powell* and *Cope & Ponder* for respondents.

964

BRADLEY, C.—This is a consolidated cause and involves an injunction suit, a suit to foreclose a deed of trust, and two counterclaims. All were tried before the court without a jury. Respondents (defendants) were successful in the trial court and this appeal followed. The amount in dispute gives the supreme court jurisdiction of the appeal.

Respondents have filed a motion to dismiss the appeal and we will first dispose of the motion. The meat of the motion is that the transcript was filed out of time. September 17, 1945, notice of appeal was filed; appeal granted, and appellant was given 90 days to file transcript. The 90 days expired December 16th. On January 11, 1946, the trial court, on oral request, made an order extending the time for filing transcript 90 days from the date of the order. The transcript was filed with the clerk of the trial court March 12, 1946, and with the clerk of the supreme court March 16th, exactly 180 days from time of appeal. Sec. 135 of the civil code, Laws 1943, p. 393, provides that within 90 days after an appeal is taken the appellant shall file transcript of the record with the clerk of the trial court. Sec. 138 provides that the trial court may extend such time "in accordance with subsection (b) of Sec. 6 of the civil code. Sec. 6(b) provides as follows:

"When by this code or by a notice given thereunder or by order of the court an act is required or allowed to be done at or within a specified time, the court for cause shown may, at any time in its discretion (1) with or without motion or notice, order the period enlarged if application therefor is made *before the expiration* of the period originally prescribed or as extended by a previous order, or (2) upon motion permit the act to be done *after* the expiration of the specified period where the failure to act was the result of *excusable* neglect; but it may not enlarge the period for filing a motion for or

granting a new trial, or for commencing an action or taking an appeal as provided by this code'' (italics ours).

In the suggestions in opposition to the motion to dismiss the appeal is an affidavit by one of the attorneys for appellant that some time after notice of appeal he was advised by the court reporter that two transcript orders were ahead of appellant's order, and that because of these and because of the extent of appellant's transcript (950 pages) he would not be able to get appellant's ▮▮▮ transcript out in 90 days from September 17th. Affiant states that he then checked the record for the exact date of appeal and inadvertently made the notation of October 27th, date appeal bond was approved, instead of September 17th, date of appeal. And affiant states that during the first part of January, 1946, he advised the court that appellant would be compelled to request extention of time for filing transcript and was advised by the court to wait until motion day, January 11th, ''as appellant would still have over two weeks of the original 90 days period.'' Affiant states, too, that at the time he, in open court January 11th, orally moved for extension of time, two of respondents' attorneys were present ''and discussed the matter with affiant and the court'', and that the court asked said attorneys ''if they had any objection to the extension being granted'', and was advised that there were no objections. Affidavits of the trial judge, the court reporter, and the acting clerk of the court corroborate the affidavit of appellant's attorney.

It would seem from respondents' reply to appellant's suggestions in opposition to the motion to dismiss that there is some argument as to who was present in court when the extension order was made, but it is not denied that at least one of respondents' attorneys was present. Sec. 2, Laws 1943, p. 357, of the new civil code provides that ''it (the code) shall be construed to secure the just, speedy, and inexpensive determination of every action.'' Only in exceptional circumstances could an action be *justly* disposed of by dismissing a meritorious appeal. The spirit of the new civil code undoubtedly is to dispose of appealed causes on their merits unless delinquency in the procedural steps to appeal have been too grave to condone, and there is no such situation here. And the new rules of this court bespeak the same liberal spirit as to disposition of appealed causes on their merits as does the new code. Rule 1.28 provides: ''These rules shall be liberally construed to promote justice, to minimize the number of cases disposed of on procedural questions and to facilitate and increase the disposition of cases on their merits.'' It will be noted that expiration of the extension was 180 days (6 months) from date of appeal and therefore did not violate supreme court rule 3.26. In the situation we rule the extension valid under the *excusable neglect* provision of Sec. 6(b), supra, and the motion to dismiss is overruled.

Hereinafter we refer to the parties as plaintiff and defendants. May 5, 1939, defendants, husband and wife, purchased a sawmill and the mill site in Poplar Bluff from the Bank of Poplar Bluff. The consideration was $12,000, and a note due on demand for that amount was given by defendants, secured by a deed of trust on the mill site and on the mill machinery and all that went to make up the mill. Defendants operated the mill and paid some on the note as they went along, but the bank advertised foreclosure, and that is when plaintiff came into the picture. Plaintiff is a sawmill man; had a mill at McLeansboro, Illinois, and was then engaged in processing lumber under such government contracts as he might obtain, and was on the lookout for lumber.

September 1, 1943, John T. Baldwin, Jr., plaintiff's brother, and defendants entered into a contract by which defendants leased to John T. for a term of 5 years a part of their mill site for the nominal rental of $100 per year, and by the contract defendants were to sell for $30 per thousand feet to John T., all the lumber meeting required specifications cut at their mill, and to deliver the lumber to such place on the leased premises as might be designated by John T. The lumber sold did not include No. 1 common and better and did not include cypress. By the contract, John T. was to purchase the note and deed of trust from the bank; such was done and there was no foreclosure by the bank. By the contract plaintiff was to hold back $3.00 on each thousand feet of lumber delivered and credit the hold back on the note and deed of trust. The contract, note and deed were assigned by John T. to plaintiff.

Upon execution of the contract plaintiff. installed on the leased premises, and under the same roof over defendants' mill, the necessary mill machinery to process the lumber obtained from defendants and operations under the contract proceeded from its execution September 1, 1943, until December 21, 1943, when plaintiff filed petition for a mandatory injunction to require. defendants to "keep and perform all of the conditions of the contract." All of the breaches claimed were alleged in the petition, but it could serve no purpose to set them out. A temporary injunction was issued. On January 3, 1944, defendants filed answer to the injunction petition and January 11th, filed motion to dissolve the temporary injunction. Defendants continued to operate the mill until February 18, 1944, at which time they closed down because, as they claimed, plaintiff would not continue to take their lumber. Plaintiff continued to operate his processing plant on the leased site and obtained the necessary lumber from others.

March 25, 1944, plaintiff filed suit to foreclose the deed of trust and to obtain judgment on the note for any deficiency that might remain after foreclosure. July 3, 1944, defendants filed answer and counterclaim in the suit to foreclose. In the counterclaim as amended defendants asked judgment against plaintiff for $24,451.01 actual damages

for lumber delivered and not accounted for and for other items, and also asked $10,000 punitive damages. Among the other claims in the counterclaim of defendants is what we may term the loss of profits claim pleaded in paragraphs 39 and 40 of the counterclaim, as follows:

"These defendants further allege . . . that on or about the 18th day of February, 1944, the plaintiff, without giving notice as required by the provisions of said contract, refused to accept any more lumber from defendants or to transact any business whatever with them.

"These defendants further state that the normal capacity and output of their said mill is approximately 18,000 feet of manufactured lumber per day; that said sawmill will normally operate one-third time; that defendants' net profit is approximately $9.00 per thousand feet of lumber manufactured at said mill; that as a direct result of the wrongful, unlawful and unauthorized acts, interference and conduct of plaintiff aforesaid these defendants have only been able during all of said period of time from September 1, 1943, to date, to produce 786,284 feet of lumber and have been damaged thereby in the sum of $16,038.00."

February 20, 1945, plaintiff filed what is termed a replication to defendants' answer and counterclaim; and in the replication denied all allegations in defendants' answer and counterclaim, except those specifically admitted, and set up a counterclaim against defendants for $15,519.46 actual damages and $5,000 punitive. Among the items of plaintiff's counterclaim against defendants is one for $11,501.74. This item represents the excess paid by plaintiff for lumber purchased from others to carry on his processing plant over the price fixed in the contract between plaintiff and defendants. February 26, 1945, defendants filed a reply to plaintiff's replication.

As stated, the injunction suit, the foreclosure suit and the counterclaims were consolidated and tried together. The trial commenced February 26, 1945, and closed March 2d. The court took the consolidated cases under advisement and rendered judgment August 14, 1945. In the injunction suit the court found for defendants and dissolved the injunction. In the suit to foreclose the court found that there was due on the note held by plaintiff and secured by the deed of trust the sum of $6,892.72, principal and interest, and on defendants' counterclaim against plaintiff the court found that plaintiff owed defendants $7,012.50 for lumber delivered to plaintiff by defendants and not accounted for, and that the difference between what defendants owed plaintiff on the note and what plaintiff owed defendants for lumber was $119.78 in favor of defendants, and the note and deed of trust were cancelled and judgment entered for defendants for the $119.78. On what we have termed the loss of profits claim in defendants' counterclaim the court found in favor of de-

fendants in the sum of $2,000. Other claims in defendants' counterclaim were denied. On plaintiff's counterclaim against defendants the court found for defendants.

In the brief plaintiff gives scant attention to the denial of his counterclaim, and but little is said of the court's action dissolving the injunction. The brief is directed almost entirely to the action of the court in finding in favor of defendants in the sum ▇ of $7,012.50 on their counterclaim for lumber not accounted for, and in the sum of $2,000 on the claim for loss of profits. Plaintiff contends that there was no substantial evidence to support either of these claims.

On the lumber shortage item of defendants' counterclaim the evidence of their sawyer and other mill men of long experience tended to show that from the logs sawed into lumber for plaintiff by defendants at their mill (a bandsaw mill) there was an overrun of 35 to 42 percent. Overrun means the excess of board feet cut from a log over the log scale. During September and October, 1943, defendants' son, an experienced mill man and lumber scaler, scaled most of the lumber delivered to plaintiff and the overrun for this period was about as defendants' evidence tended to show. But from November 1, 1943, until defendants' mill closed down February 18, 1944, plaintiff had his own scaler on the job and according to defendants' evidence plaintiff would not permit defendants' son or any one else for defendants to scale along with plaintiff's scaler. And defendants introduced evidence of statements made by plaintiff's scaler which were to the effect that he was not giving defendants a fair and correct scale of the lumber.

The court found that defendants "put through their mill 437,712 feet of logs; that same were cut into lumber and that there was an ▪overcut or overrun of thirty-five percent (35%) thereon or 153,199 feet, or a total of 590,911 board feet of lumber; that said defendant, P. A. Desgranges, sold 33,060 feet thereof to other parties and that the plaintiff herein has given said defendant, P. A. Desgranges, credit for 324,097 feet; that the defendant P. A. Desgranges, during said months aforesaid, delivered to the plaintiff, and plaintiff has not paid or given credit for 233,754 board feet of lumber at the contract price of $30.00 per thousand, or $7,012.50; that said sum is due by plaintiff to the defendant, P. A. Desgranges."

▇ Plaintiff says that the evidence as to the overrun is "vague, imaginary, uncertain, unreliable, and speculative", and that "damages cannot rest on guess work, conjecture and speculation", citing White v. Kansas City Public Service Co. (Mo. App.), 193 S. W. (2d) 60; Mundis v. Kelchner, 237 Mo. App. 805, 176 S. W. (2d) 535; 17 C. J., p. 758. Defendants' evidence as to the overrun was not speculative. Plaintiff does not contend that there is no such thing as an overrun. Such was, in effect, conceded, but plaintiff contends that overrun depends upon the size and condition of a log and that in the

logs cut for plaintiff at defendants' mill there was no overrun of consequence.

Defendants' son scaled the logs, and there was some evidence that he was overliberal in scaling in order to attract those who had timber for sale. And plaintiff's evidence tended to show that legitimate docks for cutbacks and miscuts reduced any overrun that otherwise might have existed. A *cutback* is a dock in board feet in a board for bad ends, overwidth or other defects, and a *miscut* is a board cut tapering, that is, thicker at one end than the other. Such a board is legitimately docked by a scaler when scaling a dimension order. Plaintiff's scaler said that dimension lumber is ''cut on an order specifying the size that it should be cut.'' All lumber cut by defendants for plaintiff was on dimension order. On the other hand, defendants' evidence was that miscuts are scarce where a bandsaw is used. The most that can be said for plaintiff on the issue of overrun is that the evidence is conflicting. The trial court was in a better position to determine that issue than we are, hence we will not disturb the finding on the issue of overrun.

Plaintiff, however, makes the point that defendants are in no position to complain about the lumber scale. The evidence shows that defendants became suspicious of the scale in November, 1943, and plaintiff says that such being so it was their duty to scale the lumber themselves before delivery to plaintiff; that they were guilty of laches ''in standing by, failing to scale the lumber'' after suspicion was aroused. And plaintiff says that defendants made frequent complaint about the scale being too low, but ''continued to accept and cash'' the weekly settlement checks.

The record discloses that defendants were in no position to have full freedom of action. According to the record plaintiff repeatedly threatened to foreclose his deed of trust unless his way prevailed. According to the record a scale made by defendants before delivery would have availed them nothing; they would have been compelled to take the scale of plaintiff's scaler, regardless, or run the risk of disaster by plaintiff foreclosing his deed of trust. The record is replete with evidence that plaintiff kept the fear of foreclosure before defendants almost from the beginning. Defendants' son, testifying as to why he quit scaling the lumber, said that he quit because plaintiff ''refused to permit me to scale any more''; that plaintiff said ''he would get his own scaler'', and ''I asked if we could put a man out to scale with him and he said if we did *any* scaling, we would have to take his scale (plaintiff's scaler) or else he (plaintiff) would shut it down'' (italics ours). Other threats to foreclose were: ''I will have you sold out before the sun goes down''; ''I am going to take this damn thing over and run it myself''; ''If you are going to work niggers I will foreclose.'' And there were other similar threats. There is no merit to plaintiff's point that defendants are in

no position to complain about the scale. To bar complaint on the scale would permit plaintiff to take advantage of his own wrong.

In the counterclaim, in addition to the claim for a shortage in scale, defendants claimed as appears in the counterclaim in paragraphs 39 and 40, supra, for loss of profits. And on this part of the counterclaim the court found for defendants in the sum of $2,000 as stated. In ruling the claim for loss of profits the court said: "The court further finds that plaintiff, by his actions and conduct prevented and interfered with defendant P. A. Desgranges in the operation of his mill; that such interference caused the defendant P. A. Desgranges to shut down his mill and from the time of said shut down up to the date of the trial hereof, said mill would have been able to operate a total of 99 days and have sawed therein an average of 10,000 feet of lumber per day at a profit of $9.00 per thousand feet or $90.00 per day worked, or for a total of $8,910.00. But the court further finds that the defendant P. A. Desgranges, by his actions and complacency herein has minimized the damage done him and that the sum of $2,000.00 would adequately compensate the defendant P. A. Desgranges for his injuries and damages caused by reason of the actions of the plaintiff as complained of in paragraphs 39 and 40 of defendants' counterclaim."

There was evidence as to the average cut per day when running, and the average profit per thousand feet, but there was no substantial evidence that defendants would have obtained the necessary timber to have operated for the time found by the court. That finding, we are constrained to say, is based, we think, on speculation and conjecture. Able counsel do not direct our attention to any evidence in the record that would support such finding.

Defendants had whatever timber there was on an 800 acre tract in Clay County, Arkansas. The timber deed to that tract was executed October 26, 1942, and recites a consideration of $500. There was no evidence that this tract was ever cruised, and no evidence as to how much timber had been removed or how much remained. There was evidence that logging from this tract was abandoned in November, 1943, because of weather conditions, and because of weather conditions logging could not be carried on from this tract when defendants' mill shut down. However, defendants' evidence was to the effect that logging from this tract could be carried on in the summer time. Defendant P. A. Desgranges testified that after the mill shut down he turned away logs offered to him by a Mr. Tower and a Mr. Van Buren, but he does not say how much timber these men offered to sell to him. He claimed that he could not sell lumber to others after the shut down because of the contract he had with plaintiff. There were about 200 sawmills in what is termed the Poplar Bluff territory; 48 of these were in Butler County and competition for logs was keen. A finding based on speculation and conjecture is without evidentiary

972

support and cannot stand. Federal Cold Storage Co. v. Pupillo, 346 Mo. 136, 139 S. W. (2d) 996, l. c. 1001, and cases there cited. We rule that the $2,000 judgment for loss of profits is without evidentiary support.

It is not necessary to deal specifically with the evidence pertinent to the injunction suit and plaintiff's counterclaim. It is sufficient to say that the court, we think, ruled correctly the issues therein. The judgment of the trial court on all questions in the consolidated cases, except for the $2,000 for loss of profits in defendants' counterclaim, should be affirmed, but that part of the judgment should be reversed. It is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur except *Conkling, J.*, not sitting because not a member of the Court when cause was submitted.