Paul STECKLER, Plaintiff-Respondent,

v.

Tessie STECKLER, Defendant-Appellant.

No. 7490.

Springfield Court of Appeals.

Missouri.

July 24, 1956.

R. P. Smith, Cape Girardeau, for defendant-appellant.

Ward & Reeves, Caruthersville, for plaintiff-respondent.

RUARK, Judge.

This appeal comes from an order quashing an execution issued to enforce collection of delinquent installments of a judgment for child maintenance. The main issue was whether respondent should be credited with certain payments made directly to the child.

At the outset we are met with respondent's contention (made in his brief and not by motion) that the appeal should be dismissed for failure to comply with Supreme Court Rule 1.08, 42 V.A.M.S., in that appellant's brief does not contain a fair and concise statement of the facts relative to the questions presented for determination, with specific page references to the transcript. An examination of the statement shows the charges leveled against it to be true. It completely ignores the evidence in respect to one of the principal questions involved, which was the alleged stay of the daughter with her grandmother and contention of necessity of support by the father while she, the daughter, was at such place. The statement is therefore unfair. Neither does it contain any page references to the transcript as required by the rule. In fact, it does little more than list and total a series of exhibits in reference to receipts and money order stubs and state that appellant denied the execution of some of the exhibits. One reading the statement would be led to believe that the case turned solely on the question as to whether certain of the exhibits were genuine. Even the listing of exhibits and the sums totaled is not completely accurate.

The appellate courts have repeatedly warned that failure to comply with Rule 1.08 would result in dismissal and have so entered dismissal of appeals for failure to heed such warning. Ambrose v. M. F. A. Cooperative Ass'n, Mo.Sup., en banc, 266 S.W.2d 647; Schoenhals v. Pahler, Mo.Sup., 272 S.W.2d 228; Prewitt v. Zook, Mo.App., 197 S.W.2d 691. But there are also numerous instances where the courts, while decrying the violation of the rule, have nevertheless decided the case on the merits because they recognized that the primary duty is to the litigants where important questions are presented and the

interests of simple justice require retention of the appeal. Conser v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 266 S.W.2d 587; Turner v. Emerson Electric Manufacturing Co., Mo.App., 280 S.W.2d 474; Songer v. Brittain, Mo.App., 272 S.W.2d 16.

■■ In this case we consider the fact that the suggestion of inadequacy of the statement does not come by motion to dismiss, so appellant has had no opportunity to correct or supplement her statement (although violation of the rule can result in dismissal without any motion therefor), and, having thoroughly examined the transcript, we believe the ends of justice require retention of the appeal. We observe, however, that a lawyer takes considerable risk with his client's interests when he must depend upon the indulgence of the court to retain his appeal in the face of plain violation of clear and specific provisions of the rule.

The appellant and ex-wife is Tessie Steckler. Respondent and ex-husband is Paul Steckler. The parties had one child, a daughter, Kay. For brevity's sake the parties will be referred to by their first names.

On September 5, 1950, Tessie was granted care and custody of the daughter, Kay (who was sixteen years old on the following 23rd of November), and the sum of $40 per month support and maintenance for such child. At the time of the divorce Paul lived and worked in Caruthersville, and Tessie and the daughter, Kay, lived in an apartment on Frederick Street in Cape Girardeau. Tessie's sister, Martha West, also lived on Frederick Street some three or four blocks away. Tessie's mother, Kay's maternal grandmother, who was an old age pensioner and said to be uneducated, also had rooms at some place in Cape Girardeau. Paul's parents and a brother and sister lived at 15 South Pacific Street in the same city. Tessie and Paul were not on amicable terms and had very little contact. Such contact as they had was usually through Kay as go-between.

But Paul would appear in Cape Girardeau every week or so and he appears to have retained a close and affectionate relationship with Kay.

There is no dispute that for the first three or four months some payments of support were made to Tessie. But according to Paul's testimony his daughter informed him that she was not getting any money or support from her mother. He made no investigation to determine the truth of such statement, but, as he testified, his daughter told him that and her word was good enough for him. Thereafter he commenced paying part of the sum allowed to Kay and part of it to Tessie. After a short while he entirely discontinued making any payments whatsoever to Tessie but did make payments, in varying amounts, directly to the daughter. He produced a series of receipts given him by his daughter to evidence such payments.

In attempting to justify the failure to make payments to the child's mother, Paul testified that Kay lived with Tessie for a period of eight or nine months and thereafter lived with Mrs. Huckstep, the maternal grandmother, where he would see Kay approximately every two weeks. He testified that he did not recall exactly how long Kay lived with the grandmother but that she eventually left there and rented a room next to the high school. As to the period of his daughter's stay at the grandmother's house he testified as follows:

"Q. When did she leave her mother and go to stay with her grandmother? A. I don't know exactly.

"Q. Was it before or after Kay was married? A. Before.

"Q. How long before? A. I don't know.

"Q. A week? A. I don't know.

"Q. A year? A. I don't know.

"Q. That was her grandmother Huckstep? A. That is right.

"Q. How long did she stay at her grandmother's? A. I don't know exactly.

"Q. Do you have any idea? A. It wasn't over three or four months."

As to the place (so testified) that she stayed after leaving the grandmother's, his answers were:

"Q. Did she rent it from somebody? A. Yes, sir.

"Q. Was her mother also renting a room there? A. No, sir.

"Q. She lived by herself? A. Yes, *I think it was at my father's house.*"

Under cross-examination Paul testified that most of the receipts from Kay were given him at 15 South Pacific, which was the address of his parents' home. On further cross-examination he said that part of the money (represented by exhibits 7 to 14, one-half the exhibits he produced to show payments to Kay) was mailed to Kay at Tessie's apartment on Frederick Street.

Respondent called as a witness his daughter, Kay, who testified that following the divorce in September 1950 she lived with her mother, Tessie, until June 1951 and then went to her grandmother (the old age pensioner) and stayed with her *"until I got married,"* which was June 21, 1952. She said her mother never contributed anything to her support and that prior to the time she went to her grandmother's:

"Q. Right after the divorce when you lived there until you moved to your grandmother's. What did your mother buy for you, if anything? A. I don't recall anything hardly. I just lived there and that was about it. She never fixed me a meal. I would have to go to her sister's and Augie's and fix me something to eat."

Her father started paying her money while she was still with her mother. Asked if her mother knew that her father was giving her money during this period, her answer was, "I don't think she was present. Her and Daddy don't get along." She never turned over to her mother any of the money so given her by her father. Asked what she did with the money, she said, "I would have to buy my things to go to school, and my clothes. Mostly go to the show is what I done, I reckon." That she would eat supper out with her girl friend; that her mother never cooked. She said that after she left her mother and went to stay with her grandmother she (Kay) wouldn't set foot in her mother's house because "we couldn't get along." During the period when (so she said) she was with her grandmother her father gave her $40 per month. She used this money "to buy my books and clothes and go to the show and pay grandmother. I would take Augie's kids to the show." She said that "most of the time" she paid her grandmother $5 per week for rent. Her father bought her many presents, including jewelry, earrings, watches and other articles. The witness said she had been on unfriendly terms with her mother "ever since I can remember," and again, "off and on ever since the divorce," and that she was still unfriendly to her at the time she gave her testimony. She said that she, Kay, started going with her (later to be) husband in April of 1951. (She was then sixteen years old.)

Tessie, the appellant, testified that after the divorce Kay remained with her at the apartment on South Frederick Street until her marriage in June of 1952, with the exception of about a week in which she stayed at her grandmother's. That difficulty developed between her and her daughter only when and after Kay told her that she was going to get married. That she, Kay, was then seventeen years old and had not finished high school, and she told Kay she was too young to get married. That Kay left and stayed with her grandmother about a week and then returned. That she, Tessie, worked (type of work and wages are not shown) and

maintained the apartment as a home for Kay until the day of Kay's marriage and that Kay never rented a room until after her marriage. It is not shown whether Tessie had any income except that derived from her work.

Appellant further stated that Kay acted as go-between between her and Paul in some instances, in that while Paul was still paying child support he would sit in the car in front of the house and Kay would bring the payment in and procure for him her mother's receipt. She did not know her husband was giving money to Kay, "I didn't know a thing." She stated that Kay never gave her any money which her father had given to her (Kay) and that she, Tessie, kept the apartment and worked and managed to furnish a home, food, school supplies and clothing for Kay up to the time of the marriage and that she gave up this home and went to St. Louis as soon as Kay was married. That sometime thereafter Kay wrote her and requested her to get her a job in St. Louis, which she did, and that Kay stayed with her in St. Louis until July (year not shown); and in November 1953 she, Tessie, went to California and had been there for eighteen months. She stated that she never attempted to enforce the judgment while Kay was living with her because of a desire not to have trouble with Kay over her father, that Kay "didn't want me to bother her daddy."

Martha West, sister of appellant, who lived down the street, was called as a witness, and her testimony supported Tessie in the fact that Kay lived with her mother at all times prior to her marriage except for a period of a week or a short while longer during which Kay went and stayed with the grandmother after Tessie had had some words with Kay "about staying out or something."

On this testimony the trial court sustained the motion to quash.

The principal question is whether or not a husband can claim credit against an execution issued upon a judgment for support and maintenance on account of moneys by him paid directly to the minor, which such payments bypass the mother to whom custody and support money have been awarded.

Neither of the parties has cited us to a Missouri case, and we have found none, where the question has been squarely determined. Respondent cited Olbert v. Key, Mo.App., 93 S.W.2d 1048, and Green v. Green, Mo.App., 234 S.W.2d 350. The Olbert case was a suit on a note given with a contract to support the children, and a defense of failure of consideration because of failure to support the children and thus comply with the contract. The enforcement of a judgment was not involved. The Green case was determined upon an order denying a motion to modify because a son had enlisted in the Navy. The St. Louis Court of Appeals held that since the Navy had relieved the defendant of any further liability for maintenance the decree should be modified, the effect of such enlistment being to accomplish an emancipation for so long as the military service lasted. There was the question as to whether the court would grant modification while the defendant was in arrears, and it was held that such could be done, but the court carefully pointed out, 234 S.W.2d loc. cit. 352:

"* * * the fact that such liability has now ceased to exist does not in any sense relieve defendant from any liability which has already accrued."

In Link v. Link, Mo.App., 262 S.W.2d 318, it was held that in determining whether a motion to modify should be "stayed" on the ground of arrears the court would consider the fact that for a period of time the ex-wife and child lived with the judgment debtor and were supported by him. The case of Weniger v. Weniger, Mo.App., 32 S.W.2d 773, holds that even though the plaintiff ex-wife violated the terms of the judgment such viola-

tion would not authorize a quashal of the execution while the judgment on which it was issued remained unmodified and in full force.

■ The general question is given considerable treatment in 27 C.J.S., Divorce, § 321, p. 1216 et seq., and at 2 A.L.R.2d 831 et seq., where numerous decisions from other states are annotated. We will not attempt to list and classify all of those cases here. Suffice it to say there appears to be conflict of authority as to whether a divorce court has the basic jurisdiction to credit the arrears of a support judgment with expenditures made by the father on the child's behalf *in any instance.* In some jurisdictions it is held that since the decree fixes the obligation it cannot be satisfied except by compliance with its terms; that the father has sufficient remedy in a motion to modify. Bradley v. Fowler, 30 Wash. 2d 609, 192 P.2d 969, 2 A.L.R.2d 822; Roach v. Oliver, 215 Iowa 800, 244 N.W. 899; Campbell v. Campbell, 223 Ky. 836, 4 S.W.2d 1122. In Bradley v. Fowler, supra, 192 P.2d loc. cit. 975, it was said:

"If, under such a decree as we have here before us, the father could refuse to make the payments required of him, and in an attempt to justify such refusal show that he had expended certain sums of money on his children while they were with him, it is evident there would be continuous trouble and turmoil. If a party to such a decree is not satisfied with its provisions relative to the custody of the children, or payments required to be made for their support, such party may always come into court and ask for a modification of the decree."

On the other hand, there are numerous cases which hold that where "compulsion of circumstances" makes necessary the direct expenditures by the husband, equitable considerations will require credit for such expenditures "which constitute a substantial compliance with the spirit and intent of the decree." Jackson v. Jackson,

306 Ky. 715, 209 S.W.2d 79; Schlom v. Schlom, 149 Miss. 111, 115 So. 197; Mooty v. Mooty, 131 Fla. 151, 179 So. 155; Mason v. Mason, 148 Or. 34, 34 P.2d 328; State ex rel. Meins v. Superior Court of Skagit County, 159 Wash. 277, 292 P. 1011. As to the latter group of cases, those which hold the court has basic jurisdiction to credit arrears when equitable principles demand it, the annotators are reluctant to draw and state any general rule as to when such credit may be allowed. However, it is to be observed that a great majority of them can be grouped under one umbrella, namely, the express or implied consent of the mother, who occupies the position of parent-trustee, to the payment of support money in manner other than directly to her. Thus in Briggs v. Briggs, 178 Or. 193, 165 P.2d 772, loc. cit. 778, it is stated:

"In view of *the apparent consent* of the plaintiff and the equities of the situation, the defendant will be allowed credit against his accrued indebtedness for the support of the children in the sums of $900 and $660 being the amounts which he should have paid to the plaintiff, during the time the children were in college, under the terms of the decree." (Emphasis ours.)

It seems certain that the father cannot dictate how the expenditure of the sums awarded for the child's support shall be made, and that he cannot be credited for payments when he unnecessarily interposed and made himself a volunteer and the mother did not consent to such method of payment. Wills v. Baker, 240 Mo.App. 705, 214 S.W.2d 748; Assman v. Assman, 192 Mo.App. 678, 179 S.W. 957. In this respect the language of Openshaw v. Openshaw, 86 Utah 229, 42 P.2d 191, loc. cit. 193, is expressive:

"The payments to the children themselves do not appear to have been made as payments upon alimony, but were rather the result of his fatherly inter-

est in the welfare of those children. We do not believe he should be permitted to charge them to plaintiff. By so doing he would be determining for Mrs. Openshaw the manner in which she should expend her allowances. It is a very easy thing for children to say their mother will not give them money, especially as they may realize that such a plea is effective in attaining their ends. If she is not treating them right the courts are open to the father for redress."

■ A judgment for maintenance is a judgment for money and subject to the incidents of money judgments, enforceable by execution as to installments which are in arrears. Mayes v. Mayes, 342 Mo. 401, 116 S.W.2d 1; Hagemann v. Pinska, 225 Mo.App. 521, 37 S.W.2d 463. The mother, having custody, is a parent-trustee and has the obligation and right to say how and in what manner the funds shall be spent. While it is true the mother cannot contract away the right of the children to support from the father, Messmer v. Messmer, Mo.App., 222 S.W.2d 521; Cervantes v. Cervantes, 239 Mo.App. 932, 203 S.W.2d 143, she could designate an agent to receive the payment, or direct the payment to be made toward a certain source, in which event the payment, so being made by her direction or consent, would amount to a payment to her as such parent-trustee. And we apprehend that there could be cases where the consent might be implied from the circumstances; but certainly it will not be implied from any circumstances found in this case. There was no evidence which indicates that the mother abandoned or cast her daughter out or failed to support her. (If the daughter was old enough to get married she was old enough to fix her own meals, especially when the mother worked.) At the best, the father was a volunteer in making payments to his daughter, and the evidence smacks strongly of a not entirely unsuccessful attempt to corrupt and destroy the custody and parental discipline which had been lodged in the mother. This court is not in the least inclined to lend its aid to or reward such a course of conduct by permitting the husband to escape his lawful obligation which had been expressed and declared in a judgment, especially when he had full opportunity to present the justice of such course of conduct (if he felt it was just) by means of a motion to modify the decree. Nor does the evidence establish any emancipation prior to the marriage. We will not consider any payments made to the daughter as credits on the arrears in the execution.

The only question remaining is the amount which is due under the execution. The parties agreed to a modification of the judgment to terminate support as of date of the marriage on June 21, 1952. See Hayes v. Hayes, Mo.App., 156 S.W.2d 34. The date of issuance of execution is not shown, but the motion to quash was filed November 17, 1953.

■ Paul produced three written receipts for $40 each purportedly signed by Tessie; also one Western Union money order in amount of $19.16 and six post office money order remitter's receipts in varying amounts which he said represented money that he mailed to Tessie and all of which she denied receiving. The total of all these receipts is $289.41. Tessie testified that a total of $134 and no more was received by her. She stated that she had kept the account in a book, but the book was lost and her statement was perforce based on memory. While the burden is on the judgment debtor to prove payment, Cervantes v. Cervantes, supra, 203 S.W.2d 143, such payments need not necessarily be proved by written receipts signed by the judgment creditor. Link v. Link, Mo.App., 262 S.W.2d 318. The testimony of the two parties in respect to amount of the payment was irreconcilable, but the respondent had some paper support, and the trial judge, to whom we defer in matters which involve credibility, evidently believed the respondent. We therefore

conclude the sum of $289.41 should be credited to the arrears. If the execution calls for more than the amount lawfully due, the order should be to quash the execution to the extent of the excess over the amount due and to amend it by reducing it to the correct amount. Pflanz v. Pflanz, 237 Mo.App. 873, 177 S.W.2d 631; Kennedy v. Boden, Mo.App., 231 S.W.2d 862.

Accordingly the case is reversed and remanded with directions to quash the execution to the extent (only) of $289.41 and any further sum represented by installments falling due after June 21, 1952 (the date of marriage), and to amend the principal amount to conform thereto.

McDOWELL, P. J., and STONE, J., concur.