Henry F. GADDY, Plaintiff-Appellant,

v.

STATE BOARD OF REGISTRATION FOR the HEALING ARTS of Missouri, Defendant-Respondent.

No. 8481.

Springfield Court of Appeals.

Missouri.

Nov. 23, 1965.

Rehearing Denied Dec. 22, 1965.

William C. Myers, Jr., Garold L. Morlan, Webb City, for plaintiff-appellant.

Norman H. Anderson, Atty. Gen., Jefferson City, Albert J. Stephan, Jr., Asst. Atty. Gen., St. Louis, for defendant-respondent.

STONE, Judge.

This is an appeal from a judgment of the Circuit Court of Jasper County affirming upon judicial review [Sec. 334.100, subsec. 3; Secs. 536.100 to 536.140, incl.][1] an order of the State Board of Registration for the Healing Arts (hereinafter referred to as the Board) dated November 23, 1963, revoking the license of Henry F. Gaddy, D.O., to practice the healing arts in Missouri.

■ At the outset, we are confronted with the Board's motion to dismiss Gaddy's appeal because the transcript on appeal was not filed "within 90 days from the date of filing of the notice of appeal" [Rule 82.18], i. e., within 90 days after July 28, 1964, the date on which Gaddy filed his notice of appeal to the Supreme Court of Missouri, by whom the case subsequently was transferred to this court. It is true that the transcript was filed in the Supreme Court on November 2, 1964, 97 days after the date of filing of the notice of appeal; that the circuit court had not extended the time for filing the transcript and, indeed, would have had no authority to do so by reason of the failure of appellant's counsel to comply with the requirement that "the transcript on appeal be ordered in writing from the court reporter within 30 days after the filing of such notice of appeal and a duplicate copy of such written order to the reporter be filed in the case within 15 days thereafter" [Rule 82.19]; and that no application was presented to the Supreme Court or to this court invoking the exercise of the discretionary power of the appellate court under Rule 83.26 to extend the time for filing the transcript. Clader v. City of Neosho, 354 Mo. 1190, 1191, 193 S.W.2d 620, 621; Heard v. Frye's Estate, Mo.App., 319 S.W.2d 685, 687(7). In these circumstances, the appeal

properly might be dismissed. School Dist. No. 24 v. Mease, Mo.App., 193 S.W.2d 513.

However, the spirit of our rules of procedure, which finds expression in Rule 83.-24, is that they should be construed liberally with a view to disposition of cases on their merits unless the procedural delinquency has been too grave to condone. See Baldwin v. Desgranges, 355 Mo. 959, 199 S.W.2d 353, 355(1); Lieffring v. Birt, 356 Mo. 1092, 204 S.W.2d 935, 937(7). Mindful that it does not appear that the Board or its counsel have been "injured or inconvenienced in any way" by the tardy filing of the transcript on appeal [Bohannon v. Camden Bend Drainage Dist., 240 Mo.App. 492, 208 S.W. 2d 794, 798(1, 2)] and that the case is one of paramount importance to appellant Gaddy, whose license to practice his chosen profession has been revoked, we have concluded that, in the exercise of our discretion, we should treat the transcript as having been filed by leave of court under Rule 83.26. State v. Amsden, Mo., 299 S.W.2d 498, 502(7); City of Rolla v. Riden, Mo. App., 349 S.W.2d 255, 257(1–3). See Costello v. Goodwin, 240 Mo.App. 538, 210 S.W.2d 375, 377–378. Before proceeding to the merits, we again confess our wonderment that capable counsel so frequently assume such not inconsiderable but wholly unnecessary procedural risks in dealing with the interests of their clients,[2] and we emphasize the caveat that our failure to impose the justified penalty of dismissal in the instant case must not be regarded as a precedent or as any indication that the same policy of condonation will be indulged in the future.

■ Preliminary to our factual review, it may be well for us to remind ourselves that, since the Board is an administrative body,[3] and since Section 334.100, subsec. 3,

---

1. All statutory references are to RSMo 1959, V.A.M.S., and all references to rules are to the Rules of Civil Procedure, V.A.M.R.

2. Cf. Thompson v. Jenkins, Mo., 330 S.W. 2d 802, 803; Hoover v. Whisner, Mo. App., 373 S.W.2d 176, 179; Moore v.

Rone, Mo.App., 355 S.W.2d 398, 401; Steckler v. Steckler, Mo.App., 293 S.W.2d 129, 131.

3. See State ex rel. Horton v. Clark, 320 Mo. 1190, 1199, 9 S.W.2d 635, 639; Horton v. Clark, 316 Mo. 770, 779, 293 S.W. 362, 365(9); State ex rel. McAnally v.

expressly provides that "[a]ny person whose license is revoked or suspended by the board shall have the right to have the proceedings reviewed as provided by law for the review of decisions, rules and regulations of administrative officers and bodies existing under the constitution and laws of this state," the scope of judicial review in the instant case is that provided by Article V, Section 22, Const. of 1945, as implemented by Section 536.140. Cf. Burrows v. County Court of Carter County, Mo. App., 308 S.W.2d 299, 301. Although the circuit court was in the first instance, and this court is on appeal, authorized to determine whether, upon the entire record, the Board reasonably could have made the findings and order under consideration, this does not mean that either court should substitute its own judgment on the evidence for that of the Board; and the reviewing court may set aside the findings and order of the Board only if they are clearly contrary to the overwhelming weight of the evidence, when the evidence in its entirety, including all legitimate inferences reasonably deducible therefrom, is viewed in the light most favorable to such findings and order.[4]

On March 9, 1963, the Sheriff of Jackson County served on appellant, then practicing at Lee's Summit, Missouri, written notice that the Board would, on March 30, 1963, hold a hearing to inquire into the charge "that on or about 1958 through on or about February 24, 1961, you were addicted to the habitual use of a narcotic drug or drugs" and that, "if, upon the evidence, the Board finds that such charge is true, the Board will determine whether your license to practice medicine should be revoked." See Section 334.100, subsec. 1, subd. (5), and subsec. 2. At the hearing, two witnesses were called by the attorney general

and appellant, represented by counsel, voluntarily testified. After the oral arguments of counsel, the Board took the matter under advisement and thereafter, to wit, on November 23, 1963, handed down its written findings of fact, conclusions of law, and order [Sec. 536.090], in which, inter alia, it found "that through and during the years 1959 and 1960 [appellant] was addicted to habitual use of narcotic drugs," held "that addiction to a drug habit constitutes unprofessional and dishonorable conduct within the meaning of Section 334.100," and "by unanimous vote of all members" revoked License No. 7188 theretofore issued to appellant.

Although the transcript does not reveal when appellant first was licensed to practice in Missouri, his counsel inform us, dehors the record, that appellant graduated from an osteopathic school in 1940 and interned in a Tulsa hospital. The period covered by the evidence begins in October 1958, when, as the result of an automobile accident, appellant sustained severe personal injuries, including fractures of the pelvis and of the shaft and neck of the right (?) femur. Following the accident, appellant was taken to a hospital at Claremore, Oklahoma. About 24 hours later he was moved to the Tulsa General Hospital, a 25-bed osteopathic hospital located "in a poor part of town" and owned by appellant. For about five weeks, he remained in his hospital at Tulsa under treatment, "extension mostly and sedation," by Dr. Frank Gaddy, his brother, and Dr. Frank Wolf. In November 1958, he was transported to the Mayo Clinic where Dr. F. L. Peterson did an arthrodesis, "put a pin through the neck [of the femur] and into the pelvis and then did a bone graft with two screws to hold the bone graft in place." Some eight to ten days later, appellant, then in a body

---

Goodier, 195 Mo. 551, 559, 93 S.W. 928, 929–930; 70 C.J.S. Physicians and Surgeons § 16 c, p. 875.

4. Cf. Rapp v. Industrial Com'n. of Missouri, Mo.App., 360 S.W.2d 366, 368(1); Burrows v. County Court of Carter

County, Mo.App., 308 S.W.2d 299, 301 (2); Johnson v. Simpson Oil Co., Mo. App., 394 S.W.2d 91, 93(1); Cotton v. Voss Truck Lines, Mo.App., 392 S.W.2d 428, 431(3); United Brotherhood of Carpenters, etc. v. Industrial Com'n. of Missouri, Mo.App., 363 S.W.2d 82, 89(1, 2).

cast, was returned to his hospital in Tulsa, where he remained in the cast until April 1959. Thereafter he was on crutches until "sometime during the Summer of 1959." With his hospital "in bad financial shape," he returned "to practice as soon as possible; I am sure it was in May or June" 1959. His practice included "major surgery" and "abdominal surgery" but "not much fracture work."

One of the witnesses called at the hearing conducted by the Board was Ted Hagrstrom, a state narcotic agent attached to the office of the Attorney General of Oklahoma. In company with Charles Casey, a Federal narcotic agent, Hagrstrom had interviewed appellant at his hospital in Tulsa on February 24, 1961, and on that occasion had questioned appellant about his use of narcotic drugs. According to Hagrstrom, appellant had said "that he had been using both methadone and dolophine [identified as synthetic narcotic drugs], about four cc. four times a day" and again that, "since his release from the hospital [following the automobile accident], he had been using narcotics off and on, and finally he was using as much as four cc. four times a day." When asked specifically whether he was addicted to the use of methadone or dolophine, appellant's reply (as given by witness Hagrstrom) was that "he didn't think he was actually addicted but he said, 'I presume the amount that I have been taking would indicate that I had been addicted, but I don't think I will have any trouble relieving myself from the use of it.' And [he] did not want to take treatment."

The agents checked appellant's narcotic records for the period from May 30, 1960, "at which time he [had] reported a burglary and all narcotics . . . taken," to February 24, 1961. During that period of less than nine months, appellant had purchased and had "an accountability" for 5,860 cc. of methadone, 10 mg. per cc., but had a shortage of 5,187 cc. of that narcotic drug; and, during the same period, he had purchased and had "an accountability" for 5,960 cc. of dolophine, 10 mg. per cc., but had a shortage of 5,520 cc. of that narcotic drug. During the same period, he also had purchased 100 ampules of dolophine, 100 mg. per cc., and was short the entire amount. The only "overage" found by the agents was sixty-nine 1/3 gr. tablets of some narcotic drug not identified in the record. Appellant's narcotic license was revoked "because of inaccuracies on the accounting and shortages of narcotics."

The other witness called by the attorney general was Herbert Brigham, a retired Lieutenant in the Missouri State Highway Patrol who, in the course of his work as a part-time investigator for the Board, had interviewed appellant on March 1, 1963, at his then office in Lee's Summit, Missouri. Brigham testified that appellant "did not admit to addiction" but that, after telling Brigham about the accident of October 1958, appellant said that "from the time that he was hospitalized until February of 1961 . . . he used these drugs [methadone and dolophine] as the pain required." Appellant was unwilling to state "how much he used" but "repeated himself to say he used it when the pain hit him." When asked where he had obtained the narcotic drugs, "he indicated that they were coming from hospital supplies."

In his testimony, appellant denied the use of narcotic drugs prior to the accident of October 1958, admitted the use thereof during the period from the date of accident to February 24, 1961, always (so he said) for the relief of pain, and insisted that, after the latter date, he had taken no narcotic drug but, when needed, had used Kanacin, which is not a narcotic. In appellant's words, "I did not feel that I ever became addicted to drugs" and "I don't remember taking [them] routinely at any time." On the other hand, appellant's unequivocal affirmative answers evidenced his complete agreement with counsel when on cross-examination this series of questions was propounded, "you did take [them] whenever you had the pain" and "you testified that you had the pain frequently" and "you still have pain today, as a matter of fact."

When appellant conceded that, after he had returned to practice in May or June 1959, he had continued to use narcotic drugs "when I needed it," counsel's inquiry as to "how often would that be" evoked only the casual, uninformative response, "I just really couldn't tell you," and the further query "could you give us some kind of an approximation" was answered in like vein, "I just don't see how I could." But when counsel persisted, "would it be more frequently than once a week," appellant agreed, "yes, I would say so; mostly when I was tired and hurt," and then admitted that he had followed "that practice" throughout the years of 1959 and 1960.

With respect to the shortages in narcotic drugs discovered by the agents on February 24, 1961, appellant had no explanation other than that he was "plagued with thieves at the hospital" and that he "didn't have very good help and it was impossible to get any record of value." He acknowledged that no prescriptions were signed for the narcotic drugs he used and that they "would just be removed from the hospital stock." So he agreed that he had used "some" of the missing drugs although he professed the "positive" belief that he had not used "anything like" the quantities for which he could not account.

At the close of the oral testimony, appellant's counsel moved for a continuance in order that they might take the depositions of Dr. Earl H. Laughrin, Jr., identified only as a physician who had examined appellant during May 1961, Dr. Frank Wolf who had treated appellant in Tulsa during the period of five weeks immediately following the accident in October 1958, Dr. F. L. Peterson who had operated on appellant at the Mayo Clinic during November 1958, and Dr. Frank Gaddy of Tulsa, appellant's brother. The attorney general objected to the requested continuance because "this is the first time we ever heard anything about depositions or about the testimony of these other persons" and also because "what these doctors would have said got into the record through [appellant]

without any objection . . . even though it constituted hearsay." But, when appellant's counsel inquired whether it might be stipulated that the above-named doctors would, if present, testify that appellant was not addicted to the use of narcotic drugs, the attorney general agreed so to stipulate, pointing out in the colloquy in which opposing counsel and appellant participated that Drs. Wolf and Peterson had treated appellant only in 1958, that Dr. Laughrin had examined him only in May 1961, and that Dr. Frank Gaddy was appellant's brother.

Appellant contends that the Board's finding (hereinafter referred to as such) that "through and during the years 1959 and 1960 [he] was addicted to habitual use of narcotic drugs" was not supported by competent and substantial evidence upon the whole record [Art. V, Sec. 22, Const. of 1945] and that, therefore, the Board's finding was arbitrary and unreasonable and revocation of his license involved an abuse of discretion. Section 536.140, subsec. 2, subds. (6) and (7). Prerequisite to an intelligent determination as to whether the Board's finding was supported by competent and substantial evidence is a proper understanding of what is meant by "[a]ddiction to a drug habit," as that phrase is used in Section 334.100, subsec. 1, where such addiction is designated as one of the "specifications . . . deemed unprofessional and dishonorable conduct" for which the Board may suspend or revoke a license. In turn, the meaning of the phrase "addiction to a drug habit" largely depends upon the meaning of the word "addiction."

Appellant's counsel cite and rely upon State ex rel. Johnson v. Clark, 288 Mo. 659, 671, 232 S.W. 1031, 1034(2), and State ex rel. Spriggs v. Robinson, 253 Mo. 271, 284, 161 S.W. 1169, 1172(2), in which our Supreme Court said that the predecessor statute to Section 334.100 was highly penal in its nature and should be construed strictly against the Board and liberally in favor of the physician charged. But the court did not long remain of this mind. For, in State ex rel. Horton v. Clark, 320

Mo. 1190, 1199, 9 S.W.2d 635, 638(4), the court, en banc, said that "powers conferred upon boards of health to enable them effectually to perform their important functions in safeguarding the public health should receive a liberal construction"; in State ex rel. Lentine v. State Board of Health, 334 Mo. 220, 65 S.W.2d 943, the court approved the quoted statement from Horton, supra, added that, "[l]ooking to the policy and object of our Medical Practice Act as a whole, we find it to be an exercise of the inherent police power of the state in the protection of its people attempting to secure to the people the services of competent practitioners learned and skilled in the science of medicine, of good moral character and honorable and reputable in professional conduct" [334 Mo. at 235, 65 S.W.2d at 950], and disapproved Spriggs, supra [334 Mo. at 236, 65 S.W.2d at 951]; and in Hughes v. State Board of Health, 348 Mo. 1236, 1240, 159 S.W.2d 277, 279, the court commented that, long prior to Spriggs, supra, the court "had held that the medical practice act was enacted in the interest of society" [citing State v. Hathaway, 115 Mo. 36, 21 S.W. 1081], pointed out that the primary purpose of a proceeding to revoke a physician's license is to protect and safeguard the public health, not to punish the physician [quoting from Hawker v. People of State of New York, 170 U.S. 189, 196, 18 S.Ct. 573, 576, 42 L.Ed. 1002, 1006], and disapproved both Spriggs and Johnson, supra. See also Rust v. Missouri Dental Board, 348 Mo. 616, 623, 155 S.W.2d 80, 83.

■ The overriding objective of all statutory construction is to ascertain and give effect to the legislative intention [see cases collated in 26 West's Missouri Digest, Statutes, ■ and, as aids in that quest, the courts frequently make use of various auxiliary rules. Among those widely accepted and often employed in the judicial endeavor to determine legislative intention are the following, to wit, that one of the important factors to be considered is the purpose or objective of the enactment;[5] that remedial statutes enacted in the interest of the public welfare should be construed with a view to suppression of the mischief sought to be remedied;[6] and that nontechnical words and phrases should be given their plain and ordinary meaning unless that would defeat the manifest intent and purpose of the statutory provision.[7]

■ "Addiction" is defined as "state of being addicted; indulged inclination; also, habituation, esp. to drugs"; and "addicted" is defined as "given up or over (to): devoted (to)" and as being synonymous with "accustomed, habituated, inclined, prone,

5. State ex rel. Lentine v. State Board of Health, 334 Mo. 220, 235, 65 S.W.2d 943, 950(9); State ex rel. Gerber v. Mayfield, 365 Mo. 255, 259, 281 S.W.2d 295, 297 (3); In re Duren, 355 Mo. 1222, 1235, 200 S.W.2d 343, 352(8), 170 A.L.R. 391; Garrard v. State Dept. of Public Health & Welfare, Mo.App., 375 S.W.2d 582, 590(18); City of Ava v. Yost, Mo.App., 375 S.W.2d 884, 886; Globe-Democrat Pub. Co. v. Industrial Com'n. of Missouri, Mo.App., 301 S.W.2d 846, 852(4); Lebcowitz v. Simms, Mo.App., 300 S.W.2d 827, 829(1); Willis v. American National Life Ins. Co., Mo.App., 287 S.W.2d 98, 104(8).

6. State ex rel. Lentine v. State Board of Health, supra, 334 Mo. at 235, 65 S.W.2d at 950(9); State on Inf. of Dalton v. Miles Laboratories, 365 Mo. 350, 365, 282 S.W.2d 564, 574(14); Co-Operative Live Stock Com'n. Co. v. Browning, 260 Mo. 324, 344, 168 S.W. 934, 938(2); State ex rel. Laundry, Inc. v. Public Service Com'n., 327 Mo. 93, 106, 34 S.W.2d 37, 42–43(3); Dodd v. Independence Stove & Furnace Co., 330 Mo. 662, 671, 51 S.W. 2d 114, 118(11).

7. In re Tompkins' Estate, Mo., 341 S.W. 2d 866, 871(5); City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 833(5); State ex rel. Spink v. Kemp, 365 Mo. 368, 397, 283 S.W.2d 502, 527(39); State ex inf. Rice ex rel. Allman v. Hawk, 360 Mo. 490, 495, 228 S.W.2d 785, 788(5); Berry-Kofron Dental Laboratory Co. v. Smith, 345 Mo. 922, 926, 137 S.W.2d 452, 454 (4); State ex rel. City of St. Louis v. Caulfield, 333 Mo. 270, 277, 62 S.W.2d 818, 822(6); Bellerive Inv. Co. v. Kansas City, 321 Mo. 969, 989, 13 S.W.2d 628, 638(14).

**354**

attached." When used in a bad sense, "addicted . . . refers to one who is given up or strongly disposed to some taste, practice, or pursuit." Webster's New International Dictionary (2nd Ed.), p. 30.[8] "Drug addiction" is defined simply as the "habitual use of a drug." Dorland's Illustrated Medical Dictionary (23rd Ed.; 1957), p. 33. "Addiction" is not a word of art or technical word [Palmer v. Spaulding, 299 N.Y. 368, 87 N.E.2d 301, 302; In re De La O, 59 Cal.2d 128, 28 Cal.Rptr. 489, 505, 378 P.2d 793, 809, 98 A.L.R.2d 705]; and, with the foregoing rules of statutory construction in mind, we are of the opinion that, in the case at bar, "addiction" should be given its plain and ordinary meaning.

Returning to the facts of the instant case, the Board had before it the admissions of appellant that, "from the time he was hospitalized [in October 1958] until February of 1961," he had used methadone and dolophine "when the pain hit him" and again "whenever [he] had the pain"; that he "had the pain frequently" and had taken the drugs "more frequently than once a week" throughout the years of 1959 and 1960; that "finally he was using as much as four cc. four times a day"; that, during the period of less than nine months from May 30, 1960, when he had reported a burglary and the theft of all narcotics, to February 24, 1961, when the agents had checked him, the records of his relatively small hospital reflected stupendous shortages in the two narcotic drugs which he had been using personally from the hospital stock without prescriptions therefor; and that, although "he didn't think he was

actually addicted" or would have "any trouble relieving [himself] from the use" of these narcotic drugs, appellant had told the agents on February 24, 1961, "I presume the amount that I have been taking would indicate that I had been addicted"— an observation which the Board well might have regarded as particularly significant. A party's admission against interest of a material fact relevant to an issue in the case is competent against him as substantive evidence of the fact admitted.[9] And, for a statement by a party to be competent as an admission against interest, it is not necessary that it be a direct admission of the ultimate fact in issue, but it may be competent and of probative value if it bears on the issue incidentally or circumstantially.[10]

Counsel for instant appellant argue that, to have permitted the finding "that through and during the years 1959 and 1960 [appellant] was addicted to habitual use of narcotic drugs," it would have been necessary to have shown appellant's *daily* use of such drugs throughout that two-year period. We do not agree. In considering charges of habitual drunkenness in divorce suits, our appellate courts observed many years ago that " '[a] man may be an habitual drunkard and yet be sober for days and weeks together.' " Wallace v. Wallace, Mo.App., 194 S.W. 523; Tarrant v. Tarrant, 156 Mo.App. 725, 730, 137 S.W. 56, 57. See Lester v. Sampson, Mo.App., 180 S.W. 419, 422. Similarly, we think that positive proof of *daily* use of narcotic drugs is not an essential prerequisite to a finding that one is an habitual user of such drugs.

8. See United States v. Eramdjian, D.C. Cal., 155 F.Supp. 914, 930; Aetna Life Ins. Co. v. Davey, 123 U.S. 739, 742, 8 S.Ct. 331, 332, 31 L.Ed. 315, 316; Des Moines Life Ins. Co. v. Clay, 89 Ark. 230, 116 S.W. 232(2); Rogers v. Morrill, 55 Kan. 737, 42 P. 355, 357.

9. Rutledge v. Ballance, Mo.App., 375 S.W. 2d 214, 215(1); Wells v. Wells, Mo.App., 48 S.W.2d 109, 111; Kilcoyne v. Metz, Mo.App., 258 S.W. 4, 6(5); Pinteardd v. Hosch, Mo.App., 233 S.W. 81, 83(2);

Latham v. Hosch, 207 Mo.App. 381, 387, 233 S.W. 84, 85(1). See Black v. Epstein, 221 Mo. 286, 303, 120 S.W. 754, 759(2); Concrete Steel Co. v. Reinforced Concrete Co., Mo.App., 72 S.W.2d 118, 121(2).

10. White v. Burkeybile, Mo., 386 S.W.2d 418, 422(2); Donnelly v. Goforth, Mo., 284 S.W.2d 462, 465(2). See Albertson v. Wabash R. Co., 363 Mo. 696, 704, 253 S.W.2d 184, 189(6); 31A C.J.S. Evidence § 272 a, l. c. 697.

■■ Leaning heavily on the stipulation before the Board that, if present, four physicians would have testified that in their opinion appellant was not addicted to the use of narcotic drugs, his counsel here construe that stipulation as including an agreement that Dr. Peterson, who had operated on appellant at the Mayo Clinic in November 1958 (prior to the two-year period during which the Board found that appellant had been addicted), also would have testified that appellant was not addicted in January 1960, when appellant had returned to the Clinic for examination. We think that the stipulation is not fairly susceptible of that construction for, when the attorney general agreed to stipulate as to Dr. Peterson, he was identified as "the man who treated [appellant] in November of '58 at Mayo Hospital." But, irrespective of that, we do not regard the precise construction of the stipulation of counsel as determinative here. If the physicians had testified in person, they could have done no more than to have offered their opinion evidence as expert witnesses, and the weight and value to be accorded to their testimony would have been for the Board as trier of the facts. Cf. State ex rel. Rice v. Public Service Commission, 359 Mo. 109, 116–117, 220 S.W.2d 61, 65(8–10). Even administrative bodies composed entirely of laymen are not solely dependent upon, or as to all matters conclusively bound by, the opinion evidence of medical experts. E. g., Davis v. Brezner, Mo.App., 380 S.W.2d 523, 528 (12, 13), and cases there cited; Hall v. Spot Martin, Inc., Mo., 304 S.W.2d 844, 854(6, 7). A fortiori, the seven members of the Board, themselves distinguished members of the medical profession, would not have been compelled to have embraced and followed the opinion evidence of other physicians.

■■■ In their brief, appellant's counsel "concede that the members of the Board may utilize their expert knowledge and experience in the evaluation of the evidence submitted to them." Accepting this statement of counsel, and mindful that it was for the Board, as trier of the facts, to draw from the evidence such inferences as were fairly permissible [cf. Vandaveer v. Reinhart & Donovan Const. Co., Mo.App., 370 S.W.2d 156, 163(9); Barton v. Western Fireproofing Co., Mo.App., 326 S.W.2d 344, 349(6)], we are constrained to conclude that the Board reasonably could have found "that through and during the years 1959 and 1960 [appellant] was addicted to habitual use of narcotic drugs," and that this finding was supported by competent and substantial evidence upon the whole record. Art. V, Sec. 22, Const. of 1945. If so, the Board was empowered to revoke appellant's license [Sec. 334.100, subsec. 1, subd. (5)], and the wisdom of doing so is not, and could not well be, gainsaid. See Board of Medical Registration & Examination of Indiana v. Armington, 242 Ind. 436, 178 N.E.2d 741, 93 A.L.R.2d 1391; Palmer v. Spaulding, 299 N.Y. 368, 87 N.E.2d 301; Paley v. Connecticut Medical Examining Board, 142 Conn. 522, 115 A.2d 448. For, it is common knowledge that narcotic drugs produce results other than the mere relief of pain and, in strange and diverse respects, influence and affect the reactions and judgment of users. And if, as others appropriately have pointed out, "[s]uch a blithe spirit is a hazard on the road" [People v. O'Neil, Cal.App., 37 Cal. Rptr. 734, 737], certainly he would be, in an examining or operating room, no less "a hazard" to the life and limb of unsuspecting but trusting patients.

Respondent Board's motion to dismiss the appeal is overruled, and the judgment of the circuit court affirming the order of the Board is affirmed.

RUARK, P. J., and HOGAN, J., concur