## I. Martin Paley *v.* Connecticut Medical Examining Board et al.

Baldwin, O'Sullivan, Wynne, Daly and Phillips, Js.

Argued June 9—decided June 27, 1955

*Frank J. DiSesa,* for the appellant (plaintiff).

*Louis Weinstein,* assistant attorney general, with whom, on the brief, was *John J. Bracken,* attorney general, for the appellees (defendants).

O'SULLIVAN, J. On December 7, 1953, the state department of health, a defendant to which we shall refer as the department, filed with the named defendant, herein called the board, two charges against the plaintiff. The first recited that the plaintiff was addicted to the use of habit-forming drugs; the second, that he had been guilty of immoral or unprofessional conduct by administering habit-forming drugs to his wife. Hearings thereon were held on January 6 and February 3, 1954. The board found the plaintiff not guilty on the second charge but guilty on the first and recommended to the department that his license to practice medicine and surgery in Connecticut be revoked. On February 18, 1954, the department issued an order revoking it. The plaintiff then appealed to the Superior Court from the actions of the board and of the department. The court dismissed the appeal, and the plaintiff has now appealed to this court.

The assignments of error readily resolve themselves into the following propositions: First, the board acted arbitrarily and illegally in finding on the evidence before it that the plaintiff had been addicted to the use of a habit-forming drug, and,

second, the board, in recommending the revocation of his license, and the department, in ordering the revocation, abused their respective discretions because such a penalty was too severe.

The record discloses that there was evidence before the board from which it could reasonably have found these facts: Robert C. Grieb entered the employ of the state as a narcotics agent in 1952. On June 5, 1953, he was sent to interview the plaintiff at Norwalk, where the latter maintained an office for the practice of medicine. The reason for seeking the interview was to inquire about a large number of prescriptions for demerol, a habit-forming drug, which had been issued by the plaintiff for Arthur Magnan. Magnan was the father of a secretary-receptionist who worked for the plaintiff. Upon being asked about the matter, the plaintiff told Grieb that Magnan had an inoperable cancer and needed large quantities of drugs to alleviate pain and that he, the plaintiff, was prescribing demerol for that purpose. Although Grieb noticed that the plaintiff had lost considerable weight since they had previously met and that his health seemed to have failed, and although he, Grieb, was suspicious of the plaintiff's explanation, he accepted it and so reported to his superior.

Later, as a result of a complaint from a patient that, while she was consulting the plaintiff professionally, he had fallen asleep and had to be aroused several times by the nurse, Grieb again interviewed him at his office on August 5, 1953. On that occasion, the plaintiff admitted that he had been using demerol for about a year and that he was consuming it daily at the rate of thirty cubic centimeters. Grieb, noting that the plaintiff appeared drowsy and hesitant and had difficulty in speaking and in

moving about, was of the opinion that he was, at the time, under the influence of a drug. The plaintiff expressed worry about the possibility of criminal action being taken against him, but Grieb assured him that no prosecution would occur if he cooperated fully by entering a sanitarium for treatment. The plaintiff agreed to this and on that very evening made arrangements to be hospitalized the following week at an institution in New York.

After discussing the case with the federal authorities, Grieb, at their request, obtained from the plaintiff his federal license to write prescriptions for narcotics. Grieb left the license with the federal agent in Bridgeport. On August 17, the plaintiff entered a sanitarium in New York City where he remained until September 7.

Grieb visited the plaintiff on September 28 and had a long conversation with him. The plaintiff discussed his background, his past experiences, the nature of his practice, his interest in laboratory work and like matters. He remarked that he had a medicine to cure cancer. The drawback to the medicine, he related, was the unpredictability of its reaction upon the patient and the accompaniment of generalized pain when it was taken. He went on to say that demerol was injected to overcome the ensuing pain. To check on the toxicity of any particular dose of the medicine when he decided to attempt the cure, he was accustomed to give himself a trial dose, he said, and at the same time he would administer demerol to himself. In this manner, he continued, he had become addicted to the drug.

On October 26, the plaintiff asked Grieb to have his federal license returned and on November 30 he went to Grieb's home for the same purpose. On each occasion the plaintiff justified the request by saying

that he had a patient who was suffering from cancer and that he wanted to be able to prescribe drugs to ease the patient's pain.

At the conclusion of the second hearing, the board went into executive session. After reviewing the evidence, the members voted to find the plaintiff not guilty under the second charge, which was therefore dismissed, but guilty under the first. The minutes respecting the latter charge recite: "In arriving at this decision, it was the Board's opinion that that charge had been sustained largely on the testimony of Robert Grieb, narcotic agent for the State Department of Health. Mr. Grieb was present and testified at both hearings. . . . The Board was impressed with Grieb's straightforward recital of the facts. To be sure, [Dr. Paley] and Miss Magnan [his secretary] did deny many of the statements made by Mr. Grieb, but the denials were not impressive to the Board."

One of the plaintiff's most urgently pressed claims is that the board's conclusion of guilt was arbitrary and illegal in that it was based largely upon the uncorroborated testimony of Grieb. Stated somewhat differently, the contention is that the board merely substituted Grieb's opinion for its own conclusion. The board is an administrative agency acting in a quasi-judicial capacity. *Adam* v. *Connecticut Medical Examining Board,* 137 Conn. 535, 537, 79 A.2d 350. It is required to weigh evidence and reach conclusions. Ibid. But in so doing, it should be circumspect about accepting uncorroborated testimony which consists, in the main, of a statement of oral admissions claimed to have been made by the person summoned to answer charges of professional illegalities or improprieties. Somewhat analogous to the method of proof of the corpus delicti in criminal

cases is the rule that the board, as an administrative tribunal, should not ordinarily find a professional man guilty of a charge leveled against him where proof of the act of wrongdoing is based solely on the uncorroborated evidence of persons testifying to claimed admissions by the party under attack. There is, however, nothing in the statute which precludes the board from accepting such evidence as support for its conclusions. General Statutes, Cum. Sup. 1953, § 1658c. But the fact is that, in the case at bar, the testimony of Grieb was confirmed in several particulars.

For example, the plaintiff, while under interrogation at one of the hearings before the board, testified that he was accustomed to obtain demerol by writing prescriptions for his patients and withholding in his own possession some of the narcotic after the prescriptions had been filled. Again, Dr. Howard Green of South Norwalk, a neighbor of the plaintiff, was called by Mrs. Paley at 7 o'clock on the evening of November 20, 1951, to treat her husband, the plaintiff, at his home. The doctor found the plaintiff, dressed in pajamas, lying unconscious on the floor of the dining room, frothing at the mouth and cyanotic. His condition appeared to be so bad that the doctor told Mrs. Paley to call an ambulance. She vetoed the suggestion with the statement that her husband would not approve of that plan. Dr. Green then slapped the plaintiff's face and the plaintiff shortly thereafter regained consciousness. As soon as he was aware of his surroundings, he ordered Dr. Green to leave the house at once. A similar occurrence had happened about two months previously. Dr. Sidney A. Solway of Darien was requested to treat the plaintiff about 10 p.m. on an evening in September or October, 1951. When the

doctor reached the house, he found the plaintiff on the bedroom floor in a comatose condition. He was stuporous and cyanotic. His respirations were labored and he was twitching all over. His eyes were rolling and there was froth at the corners of his mouth. Mrs. Paley said that she had found a needle in her husband's arm. After receiving a stimulant, the plaintiff revived. His speech was very confused and slurred. He repeatedly refused to permit ambulance attendants, who had been sent for, to take him to the hospital. These examples make it apparent that the testimony of Grieb was supported, if support was at all necessary, by evidence adduced through other witnesses.

We have recently had occasion to refer at length to the function of the Superior Court with respect to appeals from decisions of the medical examining board. *Gibson* v. *Connecticut Medical Examining Board,* 141 Conn. 218, 221, 104 A.2d 890. It will serve no useful purpose to repeat in detail what we said in that case. Suffice it to say that the credibility of witnesses and the determination of factual issues are matters within the province of the board; that, on appeal, the Superior Court examines the record to ascertain whether the conclusions of the board are legally supported by evidence; and that, upon seeing that they are, the court is powerless to change them. Ibid. In the light of these principles, the court in the case at bar correctly refused to rule that the conclusion of guilt on the first charge was the result of arbitrariness or illegality because of lack of ample evidence.

A further claim akin to the assignment of error under discussion is concerned with the effect of expert testimony submitted to the court by the plaintiff through Dr. Louis L. Heyn, in conformity with

the practice approved in *Jaffe* v. *State Department of Health,* 135 Conn. 339, 354, 64 A.2d 330. We are not bound to consider any claims not distinctly raised on the trial and do not do so except in unusual circumstances. *O'Keefe* v. *Bassett,* 132 Conn. 659, 660, 46 A.2d 847; Practice Book § 409; Maltbie, Conn. App. Proc., § 71. But, even if the claim had been properly presented, it is not meritorious. The facts found by the court from the testimony in question are not inconsistent with the facts upon which the board rested its determination of guilt.

Finally, the plaintiff contends that the penalty was too severe. The revocation of the plaintiff's license was within the power of the board to recommend and of the department to order. General Statutes § 4358. Since the penalty meted out was within the limits prescribed by law, it cannot be successfully challenged unless there was an abuse of discretion through its imposition. *Gibson* v. *Connecticut Medical Examining Board,* 141 Conn. 218, 230, 104 A.2d 890. We can find no such abuse here.

There is no error.

In this opinion the other judges concurred.