MOHINDER P. CHADHA *v.* CHARLOTTE
HUNGERFORD HOSPITAL ET AL.
(SC 17029)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued March 22, 2004—officially released February 15, 2005

*Jeffrey R. Babbin,* for the appellants (named defendant et al.).

*Mohinder P. Chadha,* pro se, the appellee (plaintiff).

*Michael D. Neubert* and *Maureen Sullivan Dinnan* filed a brief for the American Medical Association et al. as amici curiae.

*Jennifer A. Osowiecki* and *Patrick J. Monahan II* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Opinion*

PALMER, J. At common law, statements made in connection with judicial and quasi-judicial proceedings are absolutely privileged. The principal issue raised by this certified appeal is whether General Statutes §§ 19a-17b (b)[1] and 19a-20,[2] which provide qualified immunity to persons who give information to the medical examining board (board) of the department of public health, abrogate the common-law privilege applicable to quasi-judicial proceedings of the board. The plaintiff, Mohinder P. Chadha, commenced this action alleging, inter alia, that the named defendant, Charlotte Hungerford Hospital (hospital), submitted a false report to the National Practitioner Data Bank[3] and that defendants

---

[1] General Statutes § 19a-17b (b) provides: "There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person who provides testimony, information, records, documents, reports, proceedings, minutes or conclusions to any hospital, hospital medical staff, professional society, medical or dental school, professional licensing board or medical review committee when such communication is intended to aid in the evaluation of the qualifications, fitness or character of a health care provider and does not represent as true any matter not reasonably believed to be true."

[2] General Statutes § 19a-20 provides: "No member of any board or commission subject to the provisions of chapter 368v, chapters 369 to 375, inclusive, 378 to 381, inclusive, 383 to 388, inclusive, 398 and 399, including a member of a medical hearing panel established pursuant to subsection (g) of section 20-8a, and no person making a complaint or providing information to any of such boards or commissions of the Department of Public Health as part of an investigation pursuant to section 19a-14, or a disciplinary action pursuant to section 19a-17, shall, without a showing of malice, be personally liable for damage or injury to a practitioner arising out of any proceeding of such boards and commissions or department. A person making a complaint or providing information to any of such boards or commissions or to the Department of Public Health as part of an investigation pursuant to section 19a-14 or a disciplinary action pursuant to section 19a-17 shall be entitled to indemnification and defense in the manner set forth in section 5-141d with respect to a state officer or employee."

[3] The Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq., authorized the Secretary of Health and Human Services to establish the National Practitioner Data Bank. See 45 C.F.R. § 60.1 (2003). The National Practitioner Data Bank gathers information concerning, inter alia, disciplinary action taken against a physician by a state medical licensing board and

Samuel Langer, Michael Kovalchik, Justin Schechter and Robert Stine[4] knowingly and maliciously had made false and defamatory statements about the plaintiff to the board. The trial court denied the defendants' motion for summary judgment insofar as it was predicated on the claim that §§ 19a-17b (b) and 19a-20 do not abrogate the common-law rule of absolute immunity. The defendants appealed to the Appellate Court, which affirmed the trial court's partial denial of the defendants' motion for summary judgment. See *Chadha* v. *Charlotte Hungerford Hospital*, 77 Conn. App. 104, 122, 822 A.2d 303 (2003). We granted the defendants' petition for certification to appeal; *Chadha* v. *Charlotte Hungerford Hospital*, 265 Conn. 902, 829 A.2d 419 (2003); and now affirm the judgment of the Appellate Court.

The following relevant facts and procedural history are set forth in the opinion of the Appellate Court: "In February, 1997, the plaintiff . . . [was a licensed physician with full clinical privileges in the department of psychiatry at the defendant hospital]. On March 3, 1997, the hospital contacted the impaired physician program of the Connecticut State Medical Society[5] . . . regard-

the restriction or termination of a physician's clinical privileges by a health care entity. See 45 C.F.R. §§ 60.5, 60.8 and 60.9; see also *Brown* v. *Presbyterian Healthcare Services*, 101 F.3d 1324, 1328 n.3 (10th Cir. 1996) ("[t]he National Practitioner Data Bank is an organization created . . . to collect information on physicians, including reports of adverse peer review actions"), cert. denied sub nom. *Miller* v. *Brown*, 520 U.S. 1181, 117 S. Ct. 1461, 137 L. Ed. 2d 564 (1997); see generally 1 B. Furrow et al., Health Law (2d Ed. 2000) § 3-19.

[4] Stine no longer is a party to this litigation. We hereinafter refer to the hospital, Langer, Kovalchik and Schechter collectively as the defendants.

[5] "In 1988, the [Connecticut State Medical Society] entered into a participant association protocol agreement (protocol agreement) with the department of health services, [which is] now the department of public health. Pursuant to the protocol agreement, the [Connecticut State Medical Society] agreed to conduct its impaired physician program in accordance with the . . . protocol governing participation of established medical organizations in the implementation of Public Acts 1984, No. 84-148 (protocol), and thereby was approved as a 'participant association' . . . . According to the terms of the protocol, a person or organization mandated to report information

ing its concerns about the plaintiff's ability to practice medicine with reasonable skill and safety. The department of public health filed a 'statement of charges,' dated May 13, 1997, against the plaintiff with the [board] requesting that it 'revoke or take any other action . . . against the medical license of [the plaintiff] as it deems appropriate and consistent with law.' On [or about] May 14, 1997, Langer, Kovalchik, Schechter and . . . Stine,[6] physicians licensed to practice [medicine] in the state of Connecticut, submitted affidavits to the department of public health expressing concerns about the plaintiff's ability to practice psychiatry safely. [The affidavits were forwarded to and considered by the board in connection with its proceedings concerning the suspension of the plaintiff's license to practice medicine in Connecticut.] On May 20, 1997, the board ordered the summary suspension of the plaintiff's license to practice medicine pending a final determination by the board. On November 27, 1997, the hospital submitted a report to the National Practitioner Data Bank[7] pursuant to 42 U.S.C. § 11133 (a).[8] In January, 1998, the board issued a final

that appears to show that a physician is or may be unable to practice medicine with reasonable skill or safety may fulfill that obligation by notifying a participant organization." *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 106 n.2.

[6] At all relevant times, Langer was the chairperson of the hospital's department of psychiatry, Kovalchik was the president of the medical staff at the hospital, Stine was the director of inpatient services for the hospital's department of psychiatry, and Schechter was retained by the hospital to perform an independent review of the medical records of certain of the plaintiff's patients.

[7] See footnote 3 of this opinion.

[8] Section 11133 of title 42 of the United States Code is a provision of the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq. "In passing the Act, Congress intended to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior. H.R. Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384. Thus, the Act contains a provision granting limited immunity from suits for money damages to participants in peer review actions, thereby encouraging doctors who would otherwise fear the threat of litigation to participate in effective professional peer review procedures. See 42 U.S.C. §§ 11101 (4)–

decision ordering the immediate suspension of the plaintiff's license to practice [medicine] because he had written ten prescriptions for controlled substances while his license was under suspension.[9]

"In July, 2000, the plaintiff filed a twenty-one count amended complaint against the hospital, Langer, Kovalchik, Schechter and Stine. Thereafter, the court struck or dismissed all but five of the counts. The first of the remaining counts sounded in defamation and claimed that the hospital had submitted a false report to the National Practitioner Data Bank. The other four counts alleged that Langer, Kovalchik, Schechter and Stine maliciously had submitted false affidavits to the department of public health. The defendants answered the remaining portions of the plaintiff's amended complaint and asserted several special defenses, including absolute immunity for statements made in connection with quasi-judicial proceedings[10] and qualified immunity pursuant to General Statutes §§ 19a-20 and 19a-17b.

"On February 7, 2001, the defendants filed a motion for summary judgment. On July 31, 2001, the [trial] court granted [the defendants' motion with respect to] the claim that the hospital maliciously had submitted a false report to the National Practitioner Data Bank.[11] The

(5); 11111 (a)." (Internal quotation marks omitted.) *Brader* v. *Allegheny General Hospital*, 167 F.3d 832, 839 (3d Cir. 1999).

[9] "The plaintiff's license was to be suspended until the plaintiff entered counseling in accordance with the board's decision . . . . [Upon entering counseling and providing proof thereof to the board, the plaintiff] was to be placed on probation for five years." *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 107 n.4.

[10] The quasi-judicial nature of the proceedings before the board never has been disputed by the parties.

[11] The trial court's granting of the defendants' motion for summary judgment with respect to the plaintiff's claim that the hospital maliciously had submitted a false report to the National Practitioner Data Bank was not an issue before the Appellate Court. As the Appellate Court noted, however, "[a]lthough the [trial] court granted the motion for summary judgment in favor of the hospital on the first count, the hospital remain[ed] aggrieved by the denial of that motion with respect to the count against it on a theory

court denied [the defendants' motion with respect to the plaintiff's] claims that the physicians maliciously had submitted false affidavits to the department of public health. In its memorandum of decision, the court concluded that the defendants were protected by qualified immunity, pursuant to §§ 19a-20 and 19a-17b, and that qualified immunity and not absolute immunity applied to the defendants' submission of affidavits to the department of public health because the qualified immunity statutes, §§ 19a-20 and 19a-17b, abrogate the common-law absolute immunity provided to persons who make statements in connection with quasi-judicial proceedings.

"Although the [trial] court concluded that the plaintiff had failed to present any proof of actual malice, which is necessary to overcome the qualified immunity provided by §§ 19a-20 and 19a-17b, it nevertheless denied the defendants' motion because it found that they had failed to meet their burden pursuant to Practice Book § 17-45 et seq.[12] More particularly, the court stated that there were no documents submitted with the defendants' motion that addressed the physicians' affidavits and that, by not submitting any proof countering the plaintiff's allegations that the defendants had acted with malice, the defendants failed to meet their burden of submitting supporting documentation establishing that there was no genuine issue of material fact as to the

of respondeat superior." *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 107 n.5. Specifically, the plaintiff had alleged in his complaint that the hospital, as Stine's employer, was liable for Stine's allegedly malicious submission of a false affidavit to the department of public health.

[12] Practice Book § 17-45 provides in relevant part: "A motion for summary judgment shall be supported by such documents as may be appropriate, including but not limited to affidavits, certified transcripts of testimony under oath, disclosures, written admissions and the like. . . ."

Practice Book § 17-49 provides: "The judgment sought shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

issue of malice." *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 106–109.

The defendants appealed to the Appellate Court, claiming that the trial court improperly had determined that they were not entitled to absolute immunity for the statements contained in the affidavits that they had submitted to the department of public health. The Appellate Court noted, preliminarily, that "the denial of a motion for summary judgment is not, ordinarily, an appealable final judgment." Id., 110. The Appellate Court further observed, however, that the denial of a motion for summary judgment, which has been filed on the basis of a colorable claim of absolute immunity, is, for final judgment purposes, substantially similar to the denial of a motion to dismiss that has been filed on the basis of a colorable claim of sovereign immunity. Id. The Appellate Court concluded that because the latter is an immediately appealable final judgment; see *Shay* v. *Rossi*, 253 Conn. 134, 167, 749 A.2d 1147 (2000), overruled in part on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 828 A.2d 549 (2003); so, too, is the former. See *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 110.

The Appellate Court then proceeded to address the merits of the trial court's determination that the defendants were not entitled to judgment on the ground of absolute immunity. The Appellate Court, with one judge dissenting, affirmed the trial court's denial of the defendants' summary judgment motion on the ground of absolute immunity, concluding that the language and legislative history of §§ 19a-17b and 19a-20 supported the trial court's determination that, in enacting those two provisions, the legislature had abrogated the common-law absolute immunity that otherwise would have

shielded the defendants from liability.[13] Id., 113–14. We granted the defendants' petition for certification to appeal limited to the following two issues: "Did the Appellate Court properly conclude that: (1) a denial of a motion for summary judgment, filed on the basis of absolute immunity, is a final judgment for purposes of appeal; and (2) the trial court properly denied the defendants' motion for summary judgment?" *Chadha* v. *Charlotte Hungerford Hospital*, supra, 265 Conn. 902. We answer both questions in the affirmative and, therefore, affirm the judgment of the Appellate Court.

I

We first consider whether the Appellate Court properly determined that the denial of a motion for summary judgment, which has been filed on the basis of absolute immunity, constitutes an appealable final judgment.[14] As a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case. See, e.g., *Doublewal Corp.* v. *Toffolon*, 195 Conn. 384, 388, 488 A.2d 444 (1985); see also *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983) (right of appeal is purely

---

[13] The defendants also claimed that the trial court improperly had denied their motion for summary judgment on the basis of qualified immunity. *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 121. Specifically, the defendants maintained that the trial court improperly had denied their motion on the ground that they had failed to satisfy their burden of submitting supporting documentation demonstrating that there was no genuine issue of material fact on the issue of malice. See id. The Appellate Court declined to address the defendants' claim, however; id., 122; concluding that the trial court's denial of the defendants' motion *on that ground* was not an appealable final judgment. Id., 121–22. That determination by the Appellate Court is not at issue in this appeal.

[14] We note that the plaintiff does not challenge the Appellate Court's conclusion that the trial court's partial denial of the defendants' summary judgment motion is an immediately appealable final judgment. Nonetheless, we certified, and now address, the issue because it implicates our subject matter jurisdiction. See, e.g., *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 262 Conn. 240, 245, 811 A.2d 1272 (2002) (because our subject matter jurisdiction over appeals is limited by statute, we always must resolve any threshold jurisdictional question first).

statutory and "is limited to appeals by aggrieved parties from final judgments"). The denial of a motion for summary judgment ordinarily is an interlocutory ruling and, accordingly, not a final judgment for purposes of appeal. See, e.g., *Connecticut National Bank* v. *Rytman*, 241 Conn. 24, 34, 694 A.2d 1246 (1997). "We previously have determined [however] that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under [General Statutes] § 52-263.[15]. . . In *State* v. *Curcio*, [supra, 31], we explicated two situations in which a party can appeal an otherwise interlocutory order: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." (Citation omitted; internal quotation marks omitted.) *Esposito* v. *Specyalski*, 268 Conn. 336, 345–46 n.13, 844 A.2d 211 (2004). We agree with the Appellate Court that the denial of a motion for summary judgment satisfies the second prong of *Curcio*, and, therefore, is immediately appealable, when, as in the present case, the motion is predicated upon a colorable claim of absolute immunity.

"The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost

---

[15] General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

and the [parties] irreparably harmed unless they may immediately appeal." (Internal quotation marks omitted.) *Shay* v. *Rossi*, supra, 253 Conn. 165. Thus, a "bald assertion that the defendant will be irreparably harmed if appellate review is delayed until final adjudication . . . is insufficient to make an otherwise interlocutory order a final judgment. One must make at least a colorable claim that some recognized statutory or constitutional right is at risk." *State* v. *Curcio*, supra, 191 Conn. 34.

In *Shay* v. *Rossi*, supra, 253 Conn. 167, we held that the denial of a motion to dismiss, which had been filed on the basis of a colorable claim of sovereign immunity, constituted a final judgment for purposes of appeal. In so concluding, we observed "that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property." (Internal quotation marks omitted.) Id., 165–66. We noted, moreover, that "[a]lthough we . . . never [had] explicitly delineated this particular aspect of the doctrine in final judgment terms, our sovereign immunity cases implicitly [had] recognized that the doctrine protects against suit as well as liability—in effect, against having to litigate at all." Id., 166. We agree with the Appellate Court that this rationale also is applicable to the common-law immunity afforded participants in judicial and quasi-judicial proceedings.

Our determination is dictated by the underlying purpose of the immunity afforded at common law to those who provide information in connection with judicial and quasi-judicial proceedings, namely, "that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." (Internal quotation marks omitted.) *Pet-*

*yan* v. *Ellis*, 200 Conn. 243, 246, 510 A.2d 1337 (1986). Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This objective would be thwarted if those persons whom the common-law doctrine was intended to protect nevertheless faced the threat of suit. In this regard, the purpose of the absolute immunity afforded participants in judicial and quasi-judicial proceedings is the same as the purpose of the sovereign immunity enjoyed by the state. Thus, for the same reason that the rejection of a colorable claim of sovereign immunity gives rise to an immediately appealable final judgment—that is, to protect against the threat of suit—so, too, does the rejection of a colorable claim of absolute immunity based upon participation in judicial and quasi-judicial proceedings. In the present case, the defendants' claim of absolute immunity is colorable because our case law consistently has recognized such immunity in connection with such proceedings. E.g., *Kelley* v. *Bonney*, 221 Conn. 549, 565–66, 606 A.2d 693 (1992); *Petyan* v. *Ellis*, supra, 245–46, 250–52. Accordingly, we conclude that the trial court's partial denial of the defendants' motion for summary judgment, which had been filed on the basis of colorable claim of absolute immunity, constitutes an appealable final judgment.

## II

We next consider whether the Appellate Court properly concluded that §§ 19a-17b and 19a-20 abrogate the common-law rule of absolute immunity applicable to statements made to the board. At common law, "communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, supra, 200 Conn. 245–46. "[L]ike the privilege which is generally applied to pertinent statements

made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are quasi-judicial in nature. . . . Once it is determined that a proceeding is quasijudicial in nature, the absolute privilege that is granted to statements made in furtherance of it extends to every step of the proceeding until final disposition." (Citations omitted; internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 565–66. As we previously have explained, the affidavits containing the statements at issue in the present case were submitted to the department of public health, and thereafter forwarded to the board, in connection with allegations concerning the plaintiff that ultimately resulted in the administrative suspension of his license to practice medicine. Because the proceedings of the board that culminated in the suspension of the plaintiff's license are quasi-judicial in nature; see *Paley* v. *Connecticut Medical Examining Board*, 142 Conn. 522, 526, 115 A.2d 448 (1955) (state medical examining board "is an administrative agency acting in a quasi-judicial capacity"); see also footnote 10 of this opinion; any person making a statement in connection with those proceedings is entitled to absolute immunity under the common law. "The effect of an absolute privilege in a defamation action . . . is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously." (Internal quotation marks omitted.) *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 84, 856 A.2d 372 (2004).

Our determination of whether §§ 19a-17b and 19a-20 abrogate that common-law absolute immunity is guided by well established principles. "While the legislature's authority to abrogate the common law is undeniable, we will not lightly impute such an intent to the legislature. . . . Thus, [w]hen a statute is in derogation of common law . . . it should receive a strict construc-

tion and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction. . . . In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed. . . . The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law." (Citation omitted; internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 838–39, 836 A.2d 394 (2003). Despite the presumption that legislative action is not in derogation of the common law, we conclude that §§ 19a-17b and 19a-20 abrogate the common-law absolute immunity applicable to statements made in connection with the proceedings of the board.

We begin our analysis with a review of the language of the pertinent statutory provisions. General Statutes § 19a-17b (b) provides in relevant part that "[t]here shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person who provides testimony, information, records, documents, reports, proceedings, minutes or conclusions to any . . . professional licensing board . . . when such communication is intended to aid in the evaluation of the qualifications, fitness or character of a health care provider *and does not represent as true any matter not reasonably believed to be true.*"[16] (Emphasis added.)

---

[16] Subsection (c) of General Statutes § 19a-17b similarly provides immunity to members of a medical review committee *"provided that such member has taken action or made recommendations without malice and in the reasonable belief that the act or recommendation was warranted."* (Emphasis added.)

General Statutes § 19a-20 provides in relevant part that "[n]o member of any board or commission . . . including a member of a medical hearing panel established pursuant to subsection (g) of section 20-8a,[17] and no person making a complaint or providing information to any of such boards or commissions or the Department of Public Health as part of an investigation pursuant to section 19a-14, or a disciplinary action pursuant to section 19a-17, shall, *without a showing of malice,* be personally liable for damage or injury to a practitioner arising out of any proceeding of such boards and commissions or department. . . ." (Emphasis added.)

There is no dispute that the immunity afforded under §§ 19a-17b and 19a-20 is qualified, rather than absolute, because those provisions expressly except from their purview conduct and statements that are motivated by malice. The issue presented, therefore, is not what §§ 19a-17b and 19a-20 *say*; at least with respect to the nature of the immunity provided thereunder, namely, qualified immunity, the pertinent statutory language is unambiguous. The issue that we must decide, rather, is the *effect* of that language, if any, on the common-law absolute immunity applicable to statements made in connection with the proceedings of the board. We agree with the Appellate Court that the only reasonable interpretation of §§ 19a-17b and 19a-20 is that they abrogate the common law. As the Appellate Court concluded, there simply is no way to give effect both to the qualified immunity that those provisions provide, on the one hand, and to the absolute immunity existing at common law, on the other. See *Chadha* v. *Charlotte Hungerford Hospital,* supra, 77 Conn. App. 114. To do so would require us to ignore the clear legislative

---

[17] General Statutes § 20-8a contains the statutory provisions governing the board. Subsection (g) covers, inter alia, the establishment of a medical hearing panel to hear contested cases, the composition of the panel and the time frame within which the panel must render a proposed final decision.

mandate of §§ 19a-17b and 19a-20 that the immunity applicable to statements falling within the ambit of those provisions is *qualified* and *not absolute.*

Although the legislative history surrounding the enactment of §§ 19a-17b and 19a-20 is sparse, what little history there is tends to support our conclusion. Thus, in summarizing the proposed legislation that later became § 19a-17b, Representative Robert G. Gilligan stated, during a floor debate in the House of Representatives, that the provision "extends immunity from civil liability to any person who provides testimony or information to a medical review committee for the purpose of evaluating the qualifications, fitness or character of a health care provider *if the information does not represent as true any matter not reasonably believed to be true.*"[18] (Emphasis added.) 19 H.R. Proc., Pt. 6, 1976 Sess., p. 2382. Philip R. Dunn, who represented the Connecticut State Medical Society at a hearing of the joint standing committee on public health and safety on the proposed legislation, explained the rationale underlying the statutory grant of limited, rather than absolute, immunity. Specifically, Senator Anthony M. Ciarlone asked Dunn: "With legislation of this nature is it safe to say that perhaps you are getting [a] more candid review where we might insulate members of the review committee with legislation such as we have here?" Conn. Joint Standing Committee Hearings, Public Health and Safety, Pt. 1, 1976 Sess., p. 284. Dunn responded: "Positively, I think that you will not get a critical enough appreciation of a brother doctor's conduct or activity if the doctor that's volunteering for this particular committee feels that he's going to be exposed to any sort of litiga-

---

[18] Representative Gilligan elaborated further that the proposed legislation "extends immunity from civil liability to members of medical review committees for any actions taken if the actions were *taken without malice and [upon] the reasonable belief that the action was warranted.*" (Emphasis added.) 19 H.R. Proc., Pt. 6, 1976 Sess., p. 2382; see footnote 16 of this opinion.

tion as a result of it. *We, of course, do not want to insulate anybody from malice or if there was any sort of jealousy or some sort [of] interplay, you know, in a hospital staff . . . ."*[19] (Emphasis added.) Id.

This reason for limiting the immunity afforded persons who furnish information to medical peer review committees was recognized by the New Mexico Supreme Court in *Leyba* v. *Renger*, 114 N.M. 686, 845 P.2d 780 (1992). In *Leyba*, the court addressed a claim that is substantially similar to the claim raised by the defendants in the present case. Specifically, the New Mexico Supreme Court was called on to determine whether a New Mexico statutory scheme providing qualified immunity to members of peer review committees and to persons who furnish information to such committees superseded the common-law rule affording such persons absolute immunity. Id., 687. In concluding that the statutory scheme abrogated the common law, the court stated: "The members of peer review committees are often in direct competition with those being reviewed, and the system has the potential for abuse of the person being reviewed. Possession of hospital privileges . . . is crucial to a physician's success, and a negative decision could be tantamount to excluding a doctor from the profession as a whole. . . . This potential for abuse has been recognized by other courts. See, e.g., *Nurse Midwifery Assocs.* v. *Hibbett*, 918 F.2d 605, 614 (6th Cir. 1990) (noting that anticompetitive

---

[19] Although the foregoing legislative history appears to pertain primarily to that part of § 19a-17b dealing with the grant of qualified immunity to persons providing information in the context of peer review, similar concerns arise when a person provides information in the context of license suspension or revocation proceedings conducted by the board. Indeed, in determining whether to suspend a physician's license to practice medicine, the board necessarily must evaluate the physician's fitness to practice medicine in the same or similar manner that a medical review committee would evaluate a physician's fitness to practice medicine in determining whether to suspend that physician's privileges to admit patients to a particular hospital.

concerns are raised when competing physicians are making privilege recommendations concerning a competitor), [modified on other grounds, 927 F.2d 904 (6th Cir.), cert. denied sub nom. *Nurse Midwifery Associates* v. *Hendersonville Community Hospital*, 502 U.S. 952], 112 S. Ct. 406, 116 L. Ed. 2d 355 (1991); *Memorial Hosp. for McHenry County* v. *Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981) (pointing out the potential for physicians to use the framework of peer review groups for anticompetitive purposes)."[20] (Citation omitted.) *Leyba* v. *Renger*, supra, 689. As the Appellate Court stated, "[h]ad the legislature wanted to provide absolute immunity to those who fall within the ambit of §§ 19a-20 or 19a-17b, it could have done so. It chose not to."[21]

[20] Although *Leyba* was concerned with immunity in the context of peer review; see *Leyba* v. *Renger*, supra, 114 N.M. 687–88; we previously noted that similar concerns exist with respect to immunity in peer review proceedings and in state medical license suspension or revocation proceedings. See footnote 19 of this opinion. In fact, the same anticompetitive concerns to which the court in *Leyba* referred could arise in the context of the board's proceedings. For example, the board, in suspending a physician's license to practice medicine, could consider the testimony or statements of other physicians who admit patients to the same hospital and within the same department as the physician whose license has been suspended. Indeed, this may be the case here although it is uncertain, from our review of the record, whether certain of the physicians who had submitted affidavits to the department of public health actually admit patients to the department of psychiatry within the defendant hospital.

[21] This court previously has observed that the legislature is presumed to be aware of prior judicial decisions involving common-law rules. See, e.g., *State* v. *Kyles*, 169 Conn. 438, 442, 363 A.2d 97 (1975). Although we acknowledge that *Petyan* v. *Ellis*, supra, 200 Conn. 245–46, was the first case in which we expressly recognized that, at common law, persons who make statements in connection with quasi-judicial proceedings are afforded absolute immunity, this common-law rule was well established long before our decision in *Petyan*. E.g., *Ramstead* v. *Morgan*, 219 Or. 383, 388, 347 P.2d 594 (1959); *Reagan* v. *Guardian Life Ins. Co.*, 140 Tex. 105, 111, 166 S.W.2d 909 (1942); 3 Restatement, Torts § 585, comment (c), p. 227 (1938). See generally annot., Libel and Slander: Privilege Applicable to Judicial Proceedings As Extending to Administrative Proceedings, 45 A.L.R.2d 1296 (1956) (surveying cases extending privilege applicable to judicial proceedings to administrative proceedings). To the extent that we presume that the legislature was aware of this common-law rule, and because this court has charac-

*Chadha* v. *Charlotte Hungerford Hospital,* supra, 77 Conn. App. 117.

A 1994 amendment to § 19a-20 further supports our conclusion. In 1994, the legislature amended § 19a-20 by adding, inter alia, the following statutory language: "A person making a complaint or providing information to any of such boards or commissions or to the Department of Public Health and Addiction Services as part of an investigation pursuant to section 19a-14 or a disciplinary action pursuant to section 19a-17 shall be entitled to indemnification and defense in the manner set forth in section 5-141d[22] with respect to a state officer

terized the board as acting in a quasi-judicial capacity; see *Paley* v. *Connecticut Medical Examining Board,* supra, 142 Conn. 526; we perceive no reason why the legislature would have afforded qualified immunity to persons making statements in connection with board proceedings if the legislature had wanted to afford such persons absolute immunity. Even if the legislature was not aware of the common-law rule of absolute immunity, however, the legislature could have provided, statutorily, for absolute immunity instead of qualified immunity. Thus, regardless of whether the legislature was aware of the relevant common-law principles, there simply is no reason why the legislature would have enacted §§ 19a-17b and 19a-20 if it had intended to afford persons making statements in connection with proceedings before the board absolute, rather than qualified, immunity.

[22] General Statutes § 5-141d provides in relevant part: "(a) The state shall save harmless and indemnify any state officer or employee, as defined in section 4-141, and any member of the Public Defender Services Commission from financial loss and expense arising out of any claim, demand, suit or judgment by reason of his alleged negligence or alleged deprivation of any person's civil rights or other act or omission resulting in damage or injury, if the officer, employee or member is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious.

"(b) The state, through the Attorney General, shall provide for the defense of any such state officer, employee or member in any civil action or proceeding in any state or federal court arising out of any alleged act, omission or deprivation which occurred or is alleged to have occurred while the officer, employee or member was acting in the discharge of his duties or in the scope of his employment, except that the state shall not be required to provide for such a defense whenever the Attorney General, based on his investigation of the facts and circumstances of the case, determines that it would be inappropriate to do so and he so notifies the officer, employee or member in writing. . . ."

or employee." Public Acts 1994, No. 94-174, § 2 (P.A. 94-174), codified at General Statutes (Rev. to 1995) § 19a-20. We agree with the Appellate Court that P.A. 94-174, § 2, "further evinces the legislature's intent to provide only . . . qualified immunity to those who fall within the purview of those statutes. The amendment applies to persons who make a complaint or provide information as part of an investigation pursuant to General Statutes § 19a-14 or a disciplinary action pursuant to § 19a-17. . . . [It is presumed] that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions. . . . *State* v. *Ledbetter*, 263 Conn. 1, 16, 818 A.2d 1 (2003). Had the legislature intended for those who are provided qualified immunity by § 19a-20 to be provided with absolute immunity just because their statements were made in connection with a quasi-judicial proceeding, it would have [had] no reason to provide those very same people with indemnification and defense. Instead, it is apparent that the 1994 amendment is in keeping with the legislature's intent to provide only . . . qualified immunity to those whose status or conduct places them within the purview of either [§ 19a-20 or § 19a-17b]." (Internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 115–16.

The defendants contend that §§ 19a-17b (b) and 19a-20 are intended to provide qualified immunity for conduct that, although related to medical peer review, is not covered by common-law absolute immunity because the conduct does not occur in the context of a quasi-judicial proceeding. We are not persuaded by this argument because we agree with the Appellate Court "that almost any conduct protected by § 19a-20 would be considered to have occurred in connection with a quasi-judicial proceeding." Id., 120 n.16. Moreover, we seriously doubt that the legislature would have con-

ferred a grant of qualified immunity in such broad terms if the intended reach of that immunity were so limited. Finally, we are unwilling to ignore the plain language of §§ 19a-17b and 19a-20, which unambiguously encompasses a wide range of activities relating to medical peer review and investigatory or disciplinary proceedings of the board.

The defendants also assert that, in light of the principle that statutes in derogation of the common law must be strictly construed, the legislature should not be deemed to have abrogated the common-law absolute immunity applicable to statements made to the board in the absence of express language accomplishing that end. We reject the defendants' contention. This court never has held that the legislature cannot implicitly supersede the common law. See, e.g., *Spears* v. *Garcia*, 263 Conn. 22, 34–35, 818 A.2d 37 (2003) (legislative silence, including absence of legislative debate, did not indicate that legislature did not intend to abrogate common-law immunity when statutory language plainly dictated otherwise). In the present case, the plain language of §§ 19a-17b and 19a-20 compels the conclusion that the legislature intended to abrogate the common-law absolute immunity applicable to statements made in connection with board proceedings.

Moreover, as we have explained, and consistent with the pertinent legislative history, in particular, the remarks of Dunn on behalf of the Connecticut State Medical Society; see Conn. Joint Standing Committee Hearings, supra, p. 284 ("[w]e, of course, do not want to insulate anybody from malice or if there was any sort of jealousy or some sort [of] interplay, you know, in a hospital staff"); the legislature had reason to qualify the immunity available to persons making statements in connection with the proceedings of the board, namely, to minimize the possibility of abuse of that system. Whether we agree with that purpose is irrele-

vant, for we lack the authority to override the valid expression of legislative will that is reflected in §§ 19a-17b and 19a-20.[23] See, e.g., *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 715, 802 A.2d 731 (2002) ("just as the primary responsibility for formulating public policy resides in the legislature . . . so, too, does the responsibility for determining, within constitutional limits, the methods to be employed in achieving those policy goals" [citations omitted]); *Skindzier* v. *Commissioner of Social Services*, 258 Conn. 642, 661, 784 A.2d 323 (2001) ("[this] court is precluded from substituting its own ideas of what might be a wise provision in place of a clear expression of legislative will" [internal quotation marks omitted]). Thus, as we recently have reiterated, "the principle of narrowly construing statutes that purport to change the common law is not an absolute rule, but rather merely an important [guideline] to the determination of legislative meaning. To permit [the construction of the statute] to displace the conclusions that careful interpretation yields . . . would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based upon the premise that the legislature intends to enact reasonable public policies."[24] (Internal

[23] As this court previously has noted, moreover, the burden of establishing malice is a difficult one. *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 546, 646 A.2d 92 (1994).

[24] Of the cases relied on by the defendants in support of their position, only *Attaya* v. *Shoukfeh*, 962 S.W.2d 237 (Tex. App. 1998, writ denied), is directly on point. In *Attaya*, the Texas Court of Appeals concluded that the qualified immunity provisions of the Texas Medical Practice Act did not "repeal, destroy, diminish or supercede common law absolute immunity." Id., 239. We, like the Appellate Court; see *Chadha* v. *Charlotte Hungerford Hospital*, supra, 77 Conn. App. 119; find *Attaya* to be unpersuasive. First, in arriving at its conclusion, the court in *Attaya* made no attempt to ascertain the legislative intent behind the immunity provisions of the Texas statute but, rather, based its resolution of the abrogation claim entirely on *its* assessment of the relevant public policy considerations. See *Attaya* v. *Shoukfeh*, supra, 239–40. Furthermore, there is some question as to the continuing vitality of *Attaya* in light of subsequent appellate decisions involving the qualified immunity provisions applicable to medical peer review. See, e.g.,

quotation marks omitted.) *Spears* v. *Garcia*, supra, 263 Conn. 35.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

*Ching* v. *Methodist Children's Hospital*, 134 S.W.3d 235, 242 (Tex. App. 2003, writ denied) (holding that hospitals conducting or participating in medical peer review enjoy qualified immunity); *Dallas County Medical Society* v. *Ubinas-Brache*, 68 S.W.3d 31, 40 (Tex. App. 2001, writ denied) (construing Texas Medical Practice Act to require proof of malice in civil suits against health care entities for taking medical peer review action), cert. denied, 535 U.S. 970, 122 S. Ct. 1436, 152 L. Ed. 2d 381 (2002). Suffice it to say, however, that, to the extent *Attaya* remains good law in Texas, we do not find it to be persuasive.

